UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

In re:                                              Chapter 11

MARKETXT HOLDINGS CORP.,                            Case No. 04-12078 (ALG)

                          Debtor.

------------------------------------------------------------------x

ALAN NISSELSON, as Chapter 11 Trustee of
MarketXT Holdings Corp., and the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS,

                          Plaintiffs,

        -against-                                    Adv. Proc. No. 05-03238 (ALG)


SOFTBANK AM CORPORATION f/k/a
SOFTBANK FINANCE CORPORATION AND
SOFTBANK  INVESTMENT CORPORATION AS
MANAGING PARTNER OF SOFTBANK
CONTENTS FUND,

                          Defendants.

------------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

BRAUNER BARON ROSENZWEIG & KLEIN, LLP
Counsel for Alan Nisselson, the Chapter 11 Trustee
   By:   Howard L. Simon, Esq.
          Alison C. Gilbert, Esq.
61 Broadway, 18th Floor
New York, New York 10006

KAYE SCHOLER LLP
Counsel for the Official Committee of Unsecured Creditors
   By:   Lester M. Kirshenbaum, Esq.
          Margarita Y. Ginzburg, Esq.
          Dina S. Rovner, Esq.
425 Park Avenue
New York, New York 10022

SULLIVAN & CROMWELL LLP
Counsel for Softbank AM Corporation, f/k/a
  Softbank Finance Corporation, and Softbank Investment Corporation
  By:   James H. Carter, Esq.
        Stephen Ehrenberg, Esq.
125 Broad Street
New York, New York 10004-2498

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

This is an adversary proceeding brought by the chapter 11 trustee (the "Trustee")
and Official Committee of Unsecured Creditors (the "Committee," and together with the
Trustee, "Plaintiffs") appointed in the chapter 11 case of MarketXT Holdings Corp.
("MarketXT Holdings," "Tradescape," or the "Debtor").  Defendants are Softbank AM
Corporation, f/k/a Softbank Finance Corporation ("Softbank Finance Japan") and
Softbank Investment Corporation ("Softbank Investment") as managing partner of
Softbank Contents Fund ("Softbank Contents," and together with Softbank Finance Japan
and Softbank Investment, "Softbank" or "Defendants").  The complaint (as amended, the
"Complaint") complains of a series of transactions between the Defendants and the
Debtors between July 1999 and March 2003.  The Complaint seeks relief under §§ 510,
547 and 548 of the Bankruptcy Code and §§ 273-276 of the New York Debtor & Creditor
Law ("NYDCL"), and on the grounds of breach of fiduciary duty, undue duress, and
promissory estoppel.  Defendants have moved to dismiss the majority of the claims raised
in the Complaint.

# I. BACKGROUND

The facts set forth hereafter are alleged in the Complaint or appear from the 62 exhibits attached thereto.  For purposes of this motion, all well-pleaded facts are assumed to be true.

## **The Parties**

The Debtor (f/k/a Tradescape.com, LLC, Tradescape.com, Inc., Tradescape Corp. and TCorp) is a Delaware corporation, originally organized by Omar Amanat ("Amanat") and members of his family.  The Debtor and its affiliates and subsidiaries were providers of electronic trading services and owned and licensed certain market-related proprietary software.

Softbank Finance Japan is a wholly-owned subsidiary of Softbank Corporation ("Softbank Corp."); both were organized under the laws of Japan.  At all times relevant to the Complaint, Masayoshi Son ("Son") was the largest shareholder of Softbank Corp. Softbank Holdings, Inc. ("Softbank Holdings") is a Delaware corporation and a wholly-owned subsidiary of Softbank Corp.  Softbank Finance America Corporation ("Softbank Finance America") is a U.S. subsidiary of Softbank Finance Japan.  Softbank America Inc., a wholly-owned subsidiary of Softbank Holdings, Inc., is organized under the laws of Delaware.

## **Relationship Between Softbank and E\*Trade**

At all times relevant to the matters alleged in the Complaint, Softbank Corp. and its subsidiaries (the "Softbank Group" or the "Softbank Companies") were also equity investors in another company in the electronic trading field,  E\*Trade Financial Corporation, f/k/a E\*Trade Group, Inc. ("E\*Trade").  On August 20, 1998, Softbank Holdings acquired over 15.6 million shares of E\*Trade stock, or approximately 27.2% of

its outstanding common stock, for an aggregate purchase price of about $400 million.

During the second half of 1998 and thereafter, Ronald Fisher ("Fisher") was a principal

officer and director of Softbank Holdings and Softbank America, Inc., as well as a

director of Softbank Corp.  In or about October 2002, Fisher replaced Son as the

Softbank-designated director on the E*Trade board, and he remained an E*Trade director

at all times thereafter relevant to the Complaint.

E*Trade and Softbank were partners in business enterprises in several countries,

including the United States and Japan.  In or about June 1998, Softbank Corp. and

E*Trade entered into a joint venture agreement under which Softbank Finance Japan and

E*Trade formed E*Trade Japan, which provided online securities trading to residents of

Japan.  Softbank Finance Japan originally held a 58% ownership interest in E*Trade

Japan and E*Trade held a 42% ownership interest, in which it invested approximately $8

million.  Pursuant to the joint venture agreement, E*Trade nominated two of the five

directors of E*Trade Japan.  Christos Cotsakos ("Cotsakos"), E*Trade's Board Chairman

and Chief Executive Officer, and Judy Balint ("Balint"), E*Trade's Chief International

Officer, were selected to serve as E*Trade Japan directors.  Cotsakos and Balint received

warrants to purchase E*Trade Japan common stock in return for serving on the board.  In

connection with E*Trade Japan's IPO in September 2000, E*Trade and Softbank Finance

Japan sold a portion of their investment in E*Trade Japan.  In May 2002, E*Trade

acquired an additional 31,250 shares of stock in E*Trade Japan, in return for 3.4 million

shares of E*Trade common stock.  On or about June 2, 2003, E*Trade Japan merged with

Softbank Investment, and E*Trade exchanged its ownership interest in E*Trade Japan for

a 19.8% ownership interest in Softbank Investment.

**Softbank's Relationship With the Debtor**

Softbank Finance Japan initially invested in the Debtor through the purchase of 10% of the Debtor's common stock for $8.5 million, pursuant to a Subscription Agreement dated July 1999. Softbank Contents purchased an additional 2.72% of the Debtor's common stock for $3 million under a Subscription Agreement dated August 17, 1999 (collectively, the "Subscription Agreements"). The parties also entered into a Shareholders Agreement in 1999.

Earlier, between December 1998 and March 1999, the Debtor was also involved in negotiations with J.W. Childs Associates, L.P. ("Childs") for an investment by Childs of up to $30 million in Tradescape's common stock. In connection with this investment, Childs advanced $7 million to Tradescape to fund Tradescape's acquisition of Momentum Securities LLC ("Momentum"), an electronic brokerage firm and provider of high-speed direct-access trading technologies. The loan was to convert into a portion of Childs' $30 million investment upon the closing of that transaction. On or about June 20, 1999, the Debtor completed the acquisition of Momentum.

As further discussed below, Amanat ultimately terminated the Childs transaction, allegedly at the behest of E*Trade and Softbank. This resulted in what the Complaint alleges were $14.5 million in termination-related costs (including the repayment of the $7 million loan). Additionally, it is claimed that Tradescape incurred $4 million in professional fees in connection with a planned acquisition of Tradescape by E*Trade, which, as discussed below, was subsequently aborted by E*Trade. It is alleged that Tradescape was forced to borrow funds from Softbank Finance America to cover these expenses. In any event, on October 8, 1999, Softbank Finance America provided Tradescape with a $15 million loan evidenced by a promissory note (the "October 1999

Note"). An additional $3.375 million loan was provided by Softbank Finance America to Tradescape on November 5, 1999 (the "November 1999 Note"). On or about May 12, 2000, Softbank Finance America converted all outstanding principal and interest due on its loans to common stock of the Debtor. Thereafter, Softbank Finance Japan and its affiliates collectively owned 24% of the Debtor's common stock.[1]

The July 1999 Subscription Agreement gave Softbank Finance Japan the right to designate one member of the Debtor's board of directors, and one or more of Softbank's designated representatives attended each of the Debtor's board of directors meetings between July 1999 and December 2002. Additionally, a Tradescape board resolution of April 14, 2000 provided that at least one Softbank-designated director had to be present at a board meeting in order for a quorum to exist.

On October 12, 2000 the Tradescape Shareholders Agreement was amended to increase the directors designated by Softbank from one to two. Between July 1999 and October 2000, Softbank Finance Japan designated, first Yoshitaka Kitao ("Kitao"), the CEO of Softbank Finance Japan and a director of Softbank Corp., and thereafter Robert Takeuchi ("Takeuchi"), the president of Softbank Finance America, to serve on Tradescape's board. In or about October 2000, Softbank Finance Japan designated Shingi Yamauchi ("Yamauchi") as Softbank's second director. Yamauchi and Takeuchi continued to serve as Softbank's designated directors until they resigned in December 2002.

At the Tradescape board of directors meeting held on February 19, 2002, the board passed a resolution appointing the members of the board of directors of Tradescape

---

[1]  A letter to the Debtor dated October 16, 2001, indicated that Softbank Finance America had sold its shares of common stock in the Debtor to Softbank Finance Japan.

to serve as well on the board of directors of Tradescape's various subsidiaries, including

MarketXT, Inc (whose acquisition is discussed below).

**The 1999 E\*Trade Offer for Tradescape and Alleged Softbank Involvement**

The Complaint alleges that in July 1999, soon after Tradescape had acquired

Momentum and while the Childs $30 million investment in Tradescape was pending,

Cotsakos made an offer on behalf of E\*Trade to purchase all of the equity of Tradescape

for $300 million (the "Original E\*Trade Merger Proposal"). This purchase price was

subsequently increased to $326 million. It is alleged that Cotsakos, with the active

support of Son and Fisher, insisted that in order to effectuate E\*Trade's acquisition of

Tradescape, Amanat had to terminate the Childs Agreement, and that Amanat was

assured by Son and Cotsakos that the E\*Trade acquisition of Tradescape would be

completed if the Childs Agreement were terminated. On or about August 31, 1999,

Amanat notified Childs that he was terminating the Childs Agreement, incurring the

above-mentioned $14.5 million in termination-related costs. Subsequently, at the

direction of Son, Fisher and Kitao, Softbank Finance America loaned Tradescape

$18.375 million evidenced by the October and November 1999 Notes, to cover the

Debtor's costs and expenses incurred in connection with terminating the Childs

transaction and also in negotiating the Original E\*Trade Merger Proposal.

The Complaint further alleges that in the early fall of 1999, Ameritrade Holding

Corporation ("Ameritrade") also approached Amanat with an offer to purchase

Tradescape for $270 million, and later increased its offer (which included earn-out

compensation) to an overall value approximating $600 million. Upon being informed of

this offer, Son, Fisher and Kitao allegedly promised Amanat that Softbank would

purchase Tradescape for $326 million in the event that the E\*Trade deal did not close. In

furtherance of such promise, it is alleged, counsel for Softbank circulated an early draft of

an agreement for Softbank to acquire all of Tradescape's stock for $326 million.

Nevertheless, in November 1999 Cotsakos informed Amanat that Softbank did not want

to enter into a written agreement because a writing would require issuance of a public

announcement.  Son assured Amanat that if the E*Trade deal did not close, Softbank

would proceed with the purchase even without a formal written agreement to do so.  It is

alleged that based upon these assurances, the Debtor did not pursue a merger with

Ameritrade or move forward with other opportunities, including one with Charles

Schwab & Co.

In January 2000, E*Trade informed the Debtor that it would not pursue the

Original E*Trade Merger.  The Complaint alleges that Softbank subsequently made it

known that it would not follow through with its promise to acquire the Debtor.

**The MarketXT Merger**

Thereafter, Amanat began merger discussions with Michael Sanderson

("Sanderson") and Michael Satow ("Satow"), the principals of MarketXT, Inc.

("MarketXT"), a broker-dealer registered with the Securities and Exchange Commission

that operated as an electronic communications network.  It is alleged that Kitao agreed

that Softbank Finance Japan would head up a consortium of private investors that would

invest an additional $100 million in the merged company.  In February 2000, the Debtor

agreed to acquire MarketXT in return for $100 million of the Debtor's stock.  While the

merger did not formally close until September 2000, by the spring of that year, allegedly

at the urging of Softbank, management of the two companies began to coordinate their

efforts and operations as if the companies had already combined.  Softbank subsequently

failed to follow through with its commitment to raise $100 million in private equity, and

Tradescape was forced to use revenues generated by its Momentum subsidiary to fund MarketXT's cash needs.

Although it did not make the $100 million investment in the Debtor, Softbank extended a further $10 million loan in August 2000, evidenced by an unsecured six-month convertible promissory note, dated August 17, 2000 (the "August 2000 Note"). The loan was made by a Japanese subsidiary, Softven No. 2 Investment Enterprise Partnership ("Softven"), and the Note matured on February 17, 2001.  By that date, Tradescape's cash needs had increased and its revenues had declined, and it apparently did not have the cash to repay the loan.  Softbank extended the loan twice, to an ultimate maturity date of April 16, 2001, when the loan went into default.  It is alleged that on and after February 17, 2001, the Debtor was illiquid and unable to pay its debts as they became due in the ordinary course of its business.

**Fall 2001**

In early September 2001, Tradescape resumed merger discussions with Ameritrade.  However, the September 11, 2001 attack on the World Trade Center exacerbated the Debtor's operational and cash flow problems.  Indeed, the Complaint alleges that by late fall 2001, the Debtor had exhausted its available cash and required an additional $5 to $10 million merely to continue to operate.  Amanat, in consultation with other members of management, determined that it would be in the Debtor's best interest to conduct a sale of Momentum.  Between November 2001 and March 2002, at least eleven potential acquirers, including Ameritrade, Knight Securities, Schwab and Fidelity Investments, submitted offers to purchase Momentum and conducted due diligence. During that time, the Debtor also held discussions with E*Trade regarding the sale of Momentum.  However, at the same time, the Debtor's liquidity became increasingly

9

constrained, and Softbank refused to provide additional loans, insisting that it would only

advance funds through a preferred stock investment.

### Winter 2001 – Preferred Stock Investment

On December 21, 2001, Softbank Finance Japan and the Debtor entered into a

preferred stock purchase agreement (the "Preferred Stock Agreement") that provided for

Softbank Finance Japan to make a $3 million short-term investment in the Debtor in

exchange for a series A and B convertible preferred stock with a total liquidation

preference of $12 million.  The Preferred Stock Agreement provided that the "principal

individual stockholders" of Tradescape (including Amanat, his father, Dr. Sharif Amanat,

and James Lee, the President of Momentum and Executive Vice-President of Tradescape)

would execute personal guaranties of the August 2000 Note (the "Officer Guaranties")

and that the Debtor would repay the August 2000 Note and the preferred stock liquidation

preference concurrently with a closing of the sale of Momentum.

Softbank Finance Japan became the sole holder of the Debtor's Series A

Convertible Preferred Stock and Series B Convertible Preferred Stock.  The preferred

shares had the rights provided in the Certificate of Designations attached as Annex A to

the Preferred Stock Agreement.  Section 6(b) of the Certificate of Designations provided:

> So long as any shares of any Series are outstanding, in addition to any
> other vote or consent of stockholders required by law, the vote or consent
> of the holders of at least a majority of the shares of the Series affected
> thereby at the time outstanding, voting separately as a single class, shall be
> necessary for effecting or validating . . . [a]ny merger or consolidation of
> the Corporation with or into any entity other than a corporation, or any
> merger or consolidation of the Corporation with or into any other
> corporation. . . . [or] [a]ny Deemed Liquidation Event . . . provided,
> however, that no such vote or consent of the holders of the Series A or
> Series B shall be required if provision is made for the redemption of all
> outstanding shares of Series A at the Series A Liquidation Amount or for
> the redemption of all outstanding shares of Series B at the Series B
> Liquidation Amount, as the case may be, at or before the time when such .

10

. . merger or consolidation or Deemed Liquidation Event is to take effect,
as the case may be.

The definition of Deemed Liquidation Event included "a sale, lease or other disposal of

all or substantially all the securities or assets either of the Corporation or of its subsidiary

Momentum Securities LLC, a Delaware limited liability company . . . ."

It is further alleged that Amanat was pressured by Softbank Finance Japan to

agree to the Officer Guaranties without first clearing such provision with Dr. Amanat or

Lee.  Dr. Amanat and Mr. Lee subsequently refused to provide their personal guarantees,

and Softbank Finance Japan thereupon insisted that the Officer Guaranties be replaced

with a security interest in the intellectual property of Tradescape, Momentum, MarketXT,

and Tradescape's other subsidiaries.  On January 11, 2002, the Preferred Stock

Agreement was amended to replace the Officer Guaranties with a lien in favor of

Softbank Finance Japan, through its affiliate, Softven, in all of the intellectual properties

of the Debtor and its subsidiaries.  The Debtor also executed an intellectual property

security agreement that extended the new lien and collateralized the previously unsecured

August 2000 Note.

**Spring 2002 – E\*Trade Merger**

By March 2002, the Debtor was nearing final negotiations to sell Momentum to

E\*Trade for $280 million, to be paid in E\*Trade stock.  $100 million of the purchase

price was to be paid up-front (the "Initial Consideration"), with the remaining $180

million to be in the form of an earn-out tied to Momentum's future revenues (the "Earn-

Out").  The Debtor was also continuing to negotiate with Schwab.  However, the Debtor

had an urgent need for additional cash to keep its subsidiaries operating until the

completion of the Momentum sale.

On April 8, 2002, Tradescape's board of directors met to vote on the E*Trade offer.  Although Softbank stated that it would vote for the transaction at the board of directors' level, it reserved the right to vote its two series of preferred stock against the sale unless provisions were made for the payment of Softbank's entire liquidation preference at the time of the closing.  In any event, on or about April 10, 2002, the Debtor and E*Trade signed an agreement for the sale of Momentum to E*Trade (the "Merger Agreement").  The deal was scheduled to close later, and it in fact closed on June 3, 2002.  Between the signing of the Merger Agreement and the closing, the Debtor's liquidity problems worsened.

On or about April 30, 2002, Softbank Finance Japan and the Debtor executed a second amendment to the Preferred Stock Agreement, in which Softbank Finance Japan agreed to invest an additional $2 million in exchange for a series C convertible preferred stock with a liquidation preference of $6 million.  Additionally, Softbank Finance Japan insisted that the Debtor re-affirm that it would repay the $10 million August 2000 Note and all of the Softbank liquidation preferences concurrently with the closing of the sale of Momentum to E*Trade.  Although the additional preferred stock investment was made, the Debtor continued to be cash flow negative, and on May 23, 2002, the Debtor borrowed an additional $5 million from Softbank Finance Japan pursuant to a note (the "May 2002 Note").  The Debtors also executed a note security agreement drafted by Softbank's counsel (the "Note Security Agreement"), providing that (i) Softbank Finance Japan's security interest in all of the Debtor's intellectual property would be extended to secure the May 2002 Note, and (ii) the Debtor would place all of the E*Trade stock that it was to receive under the Merger Agreement with a third party custodian who would (a) not release to the Debtor any of the E*Trade stock until the August 2000 and May 2002

Notes had been paid in full, and (b) not release to the Debtor more than one-third of the
E*Trade stock until the preferred stock liquidation preferences had been paid in full.

The E*Trade merger with the Debtor's subsidiaries, principally Momentum,
closed on June 3, 2002. Pursuant to the Note Security Agreement, Softbank's security
interest in the Debtor's intellectual property was released.

**Cotsakos Compensation**

As noted above, the Merger Agreement provided for payment to the Debtor in the
form of E*Trade stock. It is alleged that during the time E*Trade was in negotiations
with the Debtor relating to the Merger Agreement, E*Trade failed to disclose to the
Debtor that E*Trade had provided its CEO, Cotsakos, with a compensation package in
2001 of close to $90 million, notwithstanding the fact that E*Trade's performance in
2001 was poor. According to the Complaint, disclosure of the extent of Cotsakos'
compensation had a disastrous effect on the market price of the E*Trade stock. On April
10, 2001, when the Merger Agreement was signed, E*Trade stock was selling at $9.05
per share, having fluctuated in the $8-$12 range over the previous three months.
Subsequent to public disclosure of the Cotsakos compensation package, on April 30,
2002, the price of E*Trade stock dropped precipitously, reaching $6.04 on June 3, 2002,
the day the E*Trade Merger closed. The price of E*Trade stock continued to decline
subsequent to the closing, further reducing the value of the consideration received by the
Debtor. By August 2002, the price had declined to $2.95. In January 2003 Cotsakos was
forced to resign from E*Trade.

It is alleged that as a result of the close relationship that Softbank had with
E*Trade and Cotsakos, Softbank was aware of the facts concerning Cotsakos'
compensation and knew that public disclosure of the facts would have a material adverse

effect on the value of E*Trade's stock.  Further, it is alleged that Softbank knew that

E*Trade had not disclosed Cotsakos' compensation package and that Softbank's failure

to inform the Debtor of Cotsakos' compensation damaged the Debtor in an amount

equivalent to the value of 3.3 million shares of E*Trade stock in connection with the

Initial Consideration, and at least 5.9 million shares of E*Trade stock in connection with

the Earn-Out.

In any event, upon the closing of the E*Trade Merger, the Debtor's received

11.75 million unregistered shares of E*Trade stock as the "Initial Consideration."

Approximately 2.35 million of these shares were placed into escrow pursuant to the

Merger Agreement to back-up certain of the Debtor's representations and warranties.

The 9.4 million shares not placed in escrow were subject to certain restrictions under a

lock-up provision of the Merger Agreement, which provided that the first third of the

E*Trade Stock could be sold upon E*Trade's registration of the shares, the second third

after December 31, 2002 and the final third after December 31, 2003.  Since the Debtor's

liquidity problems continued, the Debtor planned to borrow against the shares under a

short term borrowing arrangement until the shares could be freely traded.

It is alleged, however, that Softbank Finance Japan prevented the Debtor from

borrowing against the E*Trade Stock unless Softbank Finance Japan were paid in full on

its more than $17 million in unsecured claims and its $18 million in liquidation

preferences.  In particular, the Complaint charges that Softbank demanded that the Debtor

place all of its E*Trade Stock with a third party custodian, who would hold the shares

until Softbank Finance Japan had received payment in full.  The idea of a lock-up

agreement was initially rejected by Amanat, who had remained on the Debtor's Board,

but Softbank refused to take any action, including attending a board of directors meeting

14

to deal with the ongoing cash flow problems, until the Debtor executed such an

agreement.  As a result, it is alleged, on or about July 25, 2002, Amanat signed the

"Softbank Lock-Up Agreement" with Donaldson, Lufkin & Jenrette, later Credit Suisse

First Boston ("CSFB").  Pursuant to the Agreement, the Debtor placed its E*Trade Stock

in an account with CSFB and agreed that (i) CSFB would not release any E*Trade Stock

without written confirmation from Softbank Finance Japan that the August 2000 and May

2002 Notes had been paid in full, or would be paid from the proceeds of such stock, and

(ii) CSFB would not release more than 3,525,016 shares of E*Trade Stock without

receiving written confirmation from Softbank Finance Japan that its liquidation

preferences had been paid in full or would be paid from the proceeds of the disposition of

such stock.[2]

**MarketXT Shutdown**

After the E*Trade Merger closed, MarketXT, Inc. was the Debtor's sole operating

subsidiary.[3]  Its operating problems and lack of cash crippled its business and on or about

July 29, 2002 the NASD shut it down on the ground that it had a net capital deficiency of

approximately $4 million that had not been cured.  From then on, the Debtor's only

potential source of liquidity was the E*Trade Stock.  E*Trade continued to delay

registering the E*Trade Stock during the summer and fall of 2002, finally registering the

stock on or about November 26, 2002.  It is alleged that during this period Softbank

refused to deal with the liquidity crisis or its disastrous consequences.  On the contrary,

on or about September 13, 2002, Softven filed a summary judgment motion in lieu of

---

[2]   It will be recalled that the May 2002 Note Security Agreement provided that the Debtor could obtain one third of the E*Trade stock without full payment of the liquidation preferences.
[3]   Upon the completion of the E*Trade Merger, Amanat also became the "Director, Onsite Trading" of E*Trade Tradescape (the "Momentum Division"), which was an indirect, wholly owned subsidiary of E*Trade.  However, disputes soon arose between E*Trade and Amanat and on July 24, 2002, E*Trade discharged Amanat.

complaint against MarketXT in New York Supreme Court seeking payment of the

August 2000 Note (the "Softbank Litigation").[4]  Conditions worsened, and in November

2002, the Debtor was forced to cancel its D&O liability insurance policy because it was

unable to pay the necessary premium.  This compelled Amanat to tender his resignation

as the Debtor's CEO and as a director.  Shortly thereafter, the Softbank-designated

directors resigned from the Debtor's board of directors as well.

**Softbank Payoff Agreement**

During the fall of 2002, Amanat requested that Softbank consent to the sale of

70,000 shares of E*Trade Stock in order to generate cash needed to pay creditors

pursuing judgments and obtaining defaults against the Debtor.  Softbank's alleged

response was to consent to the sale of only 25,000 shares and to insist that the Debtor

resolve its dispute with E*Trade before it dealt with other matters.  Amanat repeatedly

requested the release of additional shares, but Softbank allegedly insisted that it be paid

off through an agreement relating to the disposition of the E*Trade Stock regardless of its

effect on other creditors, and also pressured Amanat to reach a settlement agreement with

E*Trade.  Eventually a draft agreement between the Debtors and Softbank was prepared

(the "Softbank Payoff Agreement").  It is alleged that on January 25, 2003, Amanat

received a telephone call from Takeuchi in which Takeuchi made threats of physical

harm against Amanat and his wife unless Amanat signed the Softbank Payoff Agreement

and proceeded to repay Softbank Finance Japan quickly.

On January 27, 2003, Amanat signed the Softbank Payoff Agreement.  At that

point, Amanat had allegedly tendered his resignation from his positions as an officer and

---

[4]   MarketXT served a cross-motion stating that the motion was premature.  These actions were settled with
prejudice pursuant to the terms of the Softbank Payoff Agreement (described below).  (Compl. Ex. 53.)

a director of the Debtor, and the Debtor's board of directors did not meet to approve the

Agreement. By its terms, the Softbank Payoff Agreement obligated the Debtor (i) to

obtain a loan against approximately 7 million shares of E*Trade Stock, representing the

number of shares that were no longer subject to the lockup under the E*Trade Merger

Agreement, and (ii) to use the proceeds of the loan to pay off the August 2000 and May

2002 Notes and the Softbank liquidation preferences. The amount payable to Softbank

would depend on the price of the E*Trade stock at the time, providing that as much as

17/18ths of the aggregate proceeds would be applied to pay the outstanding amounts,

with Softbank to receive a promissory note for the shortfall. The loan transaction was to

be consummated no later than seven days after the Softbank Payoff Agreement was

executed.

    The Softbank Payoff Agreement required the Debtor to pay approximately $18

million in two installments. The first $8 to $10 million installment was evidenced by a

note dated January 27, 2003 (the "January 2003 Note") that would become due when the

10-day average trailing closing price of E*Trade common stock reached $6.50 per share.

The payment of the second installment of $8 to $10 million was linked to the Debtor's

receipt of Earn-Out proceeds from E*Trade. The Softbank Payoff Agreement also

included a release (the "Release"), which purported to release all of the Debtor's claims

against Softbank. It is alleged that Amanat agreed to the Release only under pressure and

duress from Softbank. Subsequently, Softbank allegedly threatened to force the Debtor

into bankruptcy unless it received an initial payment under the Softbank Payoff

Agreement.

    The E*Trade stock was eventually monetized by the Debtor through two

transactions involving Bank of America, which were consummated on April 9, 2003 and

May 2, 2003.  Softbank expressly consented to the April 9th transaction (the "STARS

Transaction") by letter dated March 24, 2003, and consented to the transfer of the

E*Trade Stock from CSFB to Bank of America in an email dated April 4, 2003.  In

conjunction with the STARS Transaction, the Debtor paid Softbank $11.6 million on or

about April 9, 2003; this represented a portion of the outstanding debt under the August

2000 and May 2002 Notes (the "$11.6 Million Payment").

On or about March 28, 2003, the Debtor issued a second promissory note to

Softbank in the amount of $6,119,088.57 (the "March 2003 Note"), representing the

shortfall between what the Debtor had promised to pay Softbank in the Softbank Payoff

Agreement on the August 2000 and May 2002 Loans ($17.3 million) and the $11.6

million which was actually paid.

### Subsequent Litigation and Bankruptcy

On or about August 25, 2003, Softbank Finance Japan commenced litigation in

New York State Court seeking payment of the balance of the January 2003 and the

March 2003 Notes.  The Debtor failed to defend the action, Softbank's motion for a

default in the amount of $18,429,808.74 was granted, and a default judgment was entered

on December 9, 2004.  On April 8, 2004, after it had become clear that the parties would

not be able to reach a settlement, the Debtor filed a lawsuit in the United States District

Court for the Southern District of New York against, among others, Son, Takeuchi,

Yamauchi, Fisher, Softbank Finance Japan and Softbank Corp.  The suit alleged, in part,

that the Debtor had been improperly pressured to enter into the Softbank Payoff

Agreement.[5]

---

[5]   The date of the District Court complaint is not revealed in the Complaint but is a matter of which the
Court can take judicial notice.

On March 26, 2004, an involuntary chapter 7 case was commenced against the

Debtor.  The case was converted to a voluntary chapter 11 by order dated December 2,

2004, and a chapter 11 trustee was appointed shortly thereafter.  Softbank Finance Japan

filed two proofs of claim (Claim Nos. 27 and 50) in the Debtor's chapter 11 case, and

Softbank Investment Corporation as managing partner of Softbank Contents Fund filed

one proof of claim (Claim No. 49) (together, the "Softbank Claims").[6]  On November 23,

2005, Plaintiffs filed a joint objection to the Softbank Claims, as well as counterclaims

against Softbank.  The counterclaims contained in the Objection were subsequently

restated in the Complaint in this adversary proceeding.

**The Complaint**

The Complaint seeks recovery based upon 25 claims for relief.  Softbank has

moved to dismiss the following 20 counts: (i) promissory estoppel based upon the

promise of Softbank to purchase the Debtor in 1999 (first count); (ii) breach of the

fiduciary duty of loyalty and care with regard to the Cotsakos Compensation (second and

third counts); (iii) avoidance of transfers made under the Softbank Lock-Up Agreement

as intentional fraudulent conveyances pursuant to §§ 276 and 276-a of  NYDCL (fourth

count); (iv) avoidance of transfers made under the Softbank Lock-Up Agreement as

constructive fraudulent conveyances pursuant to §§ 273-275 of NYDCL (fifth through

seventh counts); (v) declaratory judgment against Softbank voiding the Softbank Lock-up

Agreement for undue duress (eighth count); (vi) breach of the fiduciary duty of loyalty

and care with regard to the shutdown of MarketXT (ninth and tenth counts); (vii)

avoidance of the Softbank Payoff Agreement and all transfers made thereunder as

---

[6]   Claim No. 27 was filed in the amount of $18,429,808.74, representing the default judgment.  Claim Nos.
49 and 50 were filed for unspecified amounts and were based on Softbank's ownership of the Debtor's
common stock.

intentional fraudulent conveyances pursuant to § 548(a)(1)(A) of the Bankruptcy Code (eleventh count); (viii) avoidance of the Softbank Payoff Agreement and all transfers made thereunder as intentional fraudulent conveyances pursuant to §§ 276 and 276-a of NYDCL (twelfth count); (ix) avoidance of the Softbank Payoff Agreement and all transfers made thereunder as constructive fraudulent conveyances pursuant to §§ 273-275 of NYDCL (thirteenth through fifteenth counts); (x) avoidance of the Softbank Payoff Agreement with regard to payment of the January and March 2003 Notes and the Release as constructive fraudulent conveyances pursuant to § 548(a)(1)(B) of the Bankruptcy Code (sixteenth count); (xi) declaratory judgment voiding the Softbank Payoff Agreement for undue duress (eighteenth count); (xii) declaratory judgment that the Softbank Payoff Agreement is not binding on the Debtor (nineteenth count); (xiii) equitable subordination of all Softbank claims under § 510(c) of the Bankruptcy Code (twenty-third count); and (xiv) subordination of claim 27 pursuant to § 510(b) (twenty-fifth count). Additionally, Plaintiffs request punitive damages, prejudgment interest and costs and expenses incurred in the litigation.

Defendants have not moved to dismiss Counts XVII, XX, XXI, XXII and XXIV of the Complaint, which assert the following claims: (i) avoidance of the $11.6 million payment to Softbank as a preference to an insider pursuant to § 547(b) of the Bankruptcy Code (seventeenth count); (ii) avoidance of the payments made under the Preferred Stock Agreement as constructive fraudulent conveyances pursuant to §§ 273-275 of NYDCL (twentieth through twenty-second counts); and (iii) subordination of claims 49 and 50 under § 510(b) of the Bankruptcy Code (twenty-fourth count).

## II. DISCUSSION

A motion to dismiss is governed by Fed. R. Civ. P. 12(b)(6), made applicable by Bankruptcy Rule 7012(b).  A motion to dismiss is "designed to test the legal sufficiency of the complaint, and thus does not require the Court to examine the evidence at issue." *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007 (1996); *see also Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F.Supp.2d 228, 236 (S.D.N.Y. 1999), citing *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984), *aff'd*, 865 F.2d 492 (2d Cir. 1989). The complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 99, citing *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999), *cert. denied,* 531 U.S. 1052 (2000).  On a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, including documents attached to the complaint as exhibits or incorporated by reference, matters of which judicial notice may be taken under Fed. R. Evid. 201 and those documents on which the plaintiff relied in bringing the suit.  *Granite Partners, L.P.* 58 F.Supp.2d at 236, citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).[7]

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  In accordance with the liberal pleading standards of Rule 8, "a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining

---

[7] A court can also take judicial notice of pleadings filed in court to establish the fact of litigation and of the contents of public documents filed with the SEC as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), citing Fed. R. Evid. 201(b)(2); *see also Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 27 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).

about and to know whether there is a legal basis for recovery.'" *Kittay v. Kornstein*, 230

F.3d 531, 541 (2d Cir. 2000), quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d

119, 123 (2d Cir. 1991).  A complaint alleging securities or common law fraud must also

meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil

Procedure.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000); *Chill v.

General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996); *Granite Partners, L.P. v. Bear,

Stearns & Co., Inc.*, 58 F. Supp. 2d 228, 257 (S.D.N.Y. 1999).  Pursuant to Rule 9(b), "in

all allegations of fraud, the circumstances constituting the fraud must be stated with

particularity."  *Id*. at 236, citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127

(2d Cir. 1994).  The pleadings must adequately specify the statements that were allegedly

false or misleading, provide particulars as to the alleged falsity of the statements, and

state the time and place the statements were made and the identity of the persons who

made them.  *Id*. at 236; *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).

Ordinarily, pleadings of fraud cannot be based on information and belief, except where

the facts are peculiarly within the opposing party's knowledge, and even then, "the

allegations must be accompanied by a statement of facts upon which the belief is

founded."  *Granite Partners, L.P.*, 58 F. Supp. 2d at 258-59, citing *Stern v. Leucadia

Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988).

**A.  Subordination**

      Count XXIII of the Complaint seeks to equitably subordinate the Softbank

Claims to all other allowed claims and interests pursuant to §510(c)(1) of the

Bankruptcy Code, and to transfer to the Debtor's estate any lien securing the claims

pursuant to §510(c)(2) of the Bankruptcy Code.   Count XXV of the Complaint seeks

to subordinate Claim No. 27 to all other allowed claims and interests pursuant to §

510(b) of the Bankruptcy Code.

### **Equitable Subordination**

Plaintiffs seek equitable subordination of the Softbank Claims pursuant to §

510(c) of the Bankruptcy Code.[8]  When determining whether a claim should be equitably

subordinated, courts regularly use the three-part test in *Benjamin v. Diamond (In re*

*Mobile Steel Co.*), 563 F.2d 692 (5th Cir. 1988).  Under that test: (i) the creditor must

have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted

in injury to other creditors or conferred an unfair advantage on the creditor to be

subordinated; and (iii) equitable subordination of the claim must not be inconsistent with

the other provisions of the bankruptcy laws.  *In re Mobile Steel Co.*, 563 F.2d at 700,

cited with approval in *United States v. Noland*, 517 U.S. 535, 538 (1996); *see also*

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160

F.3d 982, 986-87 (3d Cir. 1998); *New Jersey Steel Corp. v. Bank of New York*, 1997 U.S.

Dist. Lexis 18137, 1997 WL 716911, at *4 (S.D.N.Y. Nov. 17, 1997); *Official Comm. of*

*Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA,*

*Inc.)*, 264 B.R. 69, 132-33 (Bankr. S.D.N.Y. 2001); *Official Committee of Unsecured*

*Creditors of Sunbeam Corp. v. Morgan Stanley & Co, Inc. (In re Sunbeam Corp.)*, 284

B.R. 355, 363 (Bankr. S.D.N.Y. 2002).  The third prong of the *Mobile Steel* test, which

requires that equitable subordination be consistent with other provisions of the

bankruptcy laws, is of little significance today.  The *Mobile Steel* decision was rendered

under the former Bankruptcy Act, which did not specifically provide for equitable

---

[8]  Section 510(c) of the Bankruptcy Code provides, in relevant part, that a court may "under principles of
equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or
part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

subordination, and as one court has noted, "Since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994) (internal citation omitted).

Under the *Mobile Steel* test, a subordinated creditor must have engaged in a form of inequitable conduct that resulted in injury to other creditors or conferred an unfair advantage on the creditor. The phrase "inequitable conduct" encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience. It includes a misrepresentation or fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double-dealing. *In re Lois/USA*, 264 B.R. at 134; *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002). Other courts have described the type of conduct that warrants equitable subordination as including: (i) fraud, illegality or breach of fiduciary duty; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a vehicle to benefit the creditor or a third party in preference to the general creditor body. *In re Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997); *In re 80 Nassau Assocs.*, 169 B.R. at 838.

In considering a motion to dismiss an equitable subordination claim, "the Court accepts as true all of the material allegations in the Plaintiff's complaint." *Enron Corp. v. Bear, Stearns & Co., Inc.*, 2005 WL 3832053, at *6 (Bankr. S.D.N.Y. Nov. 28, 2005); *see also In re Sunbeam Corp.*, 284 B.R. at 361. Furthermore, when an equitable subordination claim involves an insider, a motion to dismiss such claim summarily is "subjected to rigorous scrutiny." *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*,

24

313 B.R. 46, 66 (Bankr. S.D.N.Y. 2004), citing *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564.  Conduct of insiders is "viewed under . . . more stringent standards" even by courts that consider equitable subordination as a "drastic and unusual remedy." *Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840-42 (Bankr. D. Del. 2006).  The burden is on the insider "to prove the good faith of the transaction and also to show its inherent fairness from the viewpoint of the debtor."  *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564.  The question is accordingly raised whether the Complaint adequately alleges that Softbank was an insider for purposes of application of principles of equitable subordination.

Section 101(31) of the Bankruptcy Code defines an insider of a corporate debtor as including a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; (vi) relative of a general partner, director, officer, or person in control of the debtor or . . . affiliate [of the debtor], or insider of an affiliate as if such affiliate were the debtor . . .."  Affiliate is in turn defined as an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ."  *See* 11 U.S.C. § 101(2).  Under these definitions, "Softbank" as the holder of 24% of the Debtor's voting stock was an insider for purposes of this motion to dismiss.[9]

Even if Softbank did not satisfy the technical definition of 'insider,' Plaintiffs also contend that Softbank should be considered an insider as a person in "control" of the

---

[9]   It may be noted that Defendants have not moved to dismiss Count 17 of the Complaint, which charges Defendants with having received a preference during the year-long preference period applicable only to insiders.

Debtor. This Opinion concludes below that the allegations of the Complaint are not, for the most part, sufficient to make the Defendants subject to "control person liability." Nevertheless, "the severity of the conduct needed to establish the control element of lender liability is generally greater than that needed to establish 'domination and control' for equitable subordination purposes . . .." *In re KDI Holdings, Inc.*, 277 B.R. 493, 516 (Bankr. S.D.N.Y. 1999), citing Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law. 417, 432 (February 1985). The fact that Softbank may not have had the fiduciary duties of a "controlling shareholder" does not mean that its actions should not be subject to more rigorous scrutiny for equitable subordination purposes than a third party that was not a 24% shareholder and Board member.

Moreover, the statutory definition of 'insider' is not controlling in any event, and a court must consider all the facts of a given case in determining whether the conduct of an entity should be subject to more rigorous scrutiny for equitable subordination purposes. *In re Ticketplanet.com*, 313 B.R. at 66, n. 14, citing *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564-65. As the Court said in *In re KDI Holdings*, "[t]he legislative history of § 101(31) indicates that the term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." 277 B.R. at 511, quoting *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 498 (S.D.N.Y. 1994), S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978). Factors considered when determining whether a lender had sufficient control to be subject to such scrutiny include "(1) control over the debtor's voting stock; (2) managerial control, including personnel decisions and decisions as to which creditors should be paid; (3) whether the relationship between the debtor and

26

lender was the result of an arms-length transaction; and (4) whether the lender is the

debtor's sole source of credit." *In re KDI Holdings, Inc.*, 277 B.R. at 512 (internal

citations omitted).

It is recognized that a lender that has a stock ownership position is entitled to

protect its debt position, seek payment in accordance with the terms of a loan and enforce

a security interest. As the Court said in *In re Clark Pipe & Supply Co.*, 893 F.2d 693,

702 (5th Cir. 1990), quoting *In re Teltronics Services, Inc.*, 29 B.R. 139, 172 (Bankr.

E.D.N.Y. 1983), "[t]here is nothing inherently wrong with a creditor carefully monitoring

his debtor's financial situation or with suggesting what course of action the debtor ought

to follow." *See also In re W.T. Grant*, 699 F.2d 599, 610 (2d Cir. 1983). The Complaint

charges, however, that in addition to its position as lender, Softbank held two seats on the

Board of Directors, controlled the Board's ability to obtain a quorum and had significant

rights as a preferred stockholder, and that it used these powers to its advantage and to the

disadvantage of other creditors. (*See* Complaint ¶¶ 20, 127-129, 134-135, 137, 153-155,

159-162, 168-194, 310.) Although it is recognized that Softbank had rights as a secured

creditor and that none of the above necessarily subjected it to liability, the allegations of

the Complaint control on this motion to dismiss. The Complaint contains allegations that

raise core equitable subordination issues and that are sufficient to (i) make Defendants

subject to a higher level of scrutiny for purposes of equitable subordination, required to

show the good faith of a transaction and its inherent fairness to the debtor and its other

creditors; and (ii) state a claim under the *Mobile Steel* test that the creditor engaged in (x)

some type of inequitable conduct that (y) resulted in injury to other creditors and an

unfair advantage to itself. Defendants' motion to dismiss Count XXIII of the Complaint

is denied.

**Subordination of Claim Relating to the Purchase or Sale of a Security**

Plaintiffs also seek subordination of Softbank's Claim 27 pursuant to § 510(b) of the Bankruptcy Code.  Section 510(b) provides for the mandatory subordination of a claim arising from the rescission of a purchase or sale of a security of a debtor, for damages arising from the purchase or sale of such security, or for reimbursement or contribution on account of such a claim.  5 King, *et al.*, *Collier on Bankruptcy* ¶ 510.04 (15th ed. rev. 2006).[10]

Claim No. 27, filed by Softbank Finance Japan in the amount of $18,429,808.74, is based upon an action it commenced on August 25, 2003 in New York State Supreme Court, seeking payment on the January 2003 and March 2003 Notes.  The Debtor failed to defend, and Softbank Finance Japan obtained a default judgment in the amount of $18,429,808.74.  Plaintiff observes that the original consideration underlying the Notes included the liquidation preferences under the three issues of preferred stock previously held by Softbank.[11]  Therefore, Plaintiff argues, the underlying basis for Claim No. 27 is the Debtor's preferred stock, and Claim No. 27 is subject to mandatory subordination under § 510(b) of the Bankruptcy Code.  Plaintiffs contend that strong policy considerations support subordination, in

---

[10]  Section 510(b) of the Bankruptcy Code provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

[11]  In December of 2001, the Preferred Stock Agreement was entered into by Softbank and the Debtor, which provided for a $3 million investment by Softbank Finance Japan in return for series A and B convertible preferred stock with a liquidation preference of $12 million.  An amendment to the Preferred Stock Agreement in April of 2002 provided an additional $2 million investment in exchange for series C convertible preferred stock with an additional liquidation preference of $6 million.

that "[t]he purpose of section 510(b) is to prevent shareholders, who assume the risk

of a business' failure by investing in securities rather than debt instruments, from

filing claims as creditors when the debtor does fail." *Official Comm. of Unsecured*

*Creditors v. Am. Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778,

782 (Bankr. D. Del. 2004).

Plaintiffs cite no authority for the proposition that a court may use § 510(b) to

disregard a note held by a creditor and subordinate the claim based on the fact that, at

some time in the past, the debt had its genesis in a stock interest.  The cases reject any

such reading.  For example, in *In re Montgomery Ward Holding Corp.*, 272 B.R. 836

(Bankr. D. Del. 2001), the Court considered a claim that originated prior to the

bankruptcy through the redemption of an issue of stock.  The debtor argued that the

claim "arose from" the purchase of stock, but the Court rejected the contention,

holding that the debtor's

> argument is premised on a distended interpretation of the causal
> relationship between the purchase or sale of the securities and the type of
> claim subject to subordination.  The plain language of § 510(b) is more
> limited.  It applies only to a claim that directly concerns the stock
> transaction itself, i.e., the actual purchase and sale of the debtor's security
> must give rise to the contested claim.

*In re Montgomery Ward*, 272 B.R. at 842.  *See also In re Washington Bancorporation*,

C.A. No. 95-1340 (RCL), 1996 U.S. Dis. Lexis 3876, at *60-*61 (D. D.C. Mar. 19,

1996); *In re Mobile Tool Int'l, Inc.*, 306 B.R at 780; *In re Wyeth Co.*, 134 B.R. 920,

921 (Bankr. W.D. Mo. 1991); *In re Blondheim Real Estate, Inc.*, 20 C.B.C.2d 96, 91

B.R. 639 (Bankr. D.N.H. 1988); *In re North Am. Cattle Co.*, 51 B.R. 822, 825 (W.D.

Mi. 1985); 5 King, et al. *Collier on Bankruptcy* ¶ 510.04[6] (15th ed. rev. 2006).

In *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006), the Circuit Court, in an extensive analysis of § 510(b), gave a broad reading to the term "arising from" as used in § 510(b) but nevertheless acknowledged the limits of the section.  It held that the critical issues in determining whether subordination is required under § 510(b) are (i) whether the party to be subordinated "took on the risk and return expectations of a shareholder, rather than a creditor;" and (ii) whether that party "seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor."  *In re Med Diversified*, 461 F.3d at 256.  Neither factor is present here.  Softbank may have taken an equity risk when it purchased preferred stock, but by the date of the initial bankruptcy petition it was a creditor, not an equity holder.  It is black letter law that claims are analyzed as of the date of the filing of a petition, not as of a hypothetical date in the past.  *See* 5 King, et al., *Collier on Bankruptcy* ¶ 506.04 (15th ed. rev. 2006).  There is no indication that any creditor could have extended credit to the Debtor in reliance on Softbank's holdings.  If Plaintiffs could avoid the transaction(s) that converted Softbank's equity interest into a debt, Softbank would be left as the holder of an equity interest, and Plaintiffs would not be required to rely on § 510(b) to render Softbank subordinated to debt.  But § 510(b) is not an avoidance provision and does not, in and of itself, give a trustee authority to recharacterize a claim based upon the creditor's past status as a stockholder.

The Court in *Med Diversified* concluded with the observation that "we interpret section 510(b) broadly" but in "doing so, we acknowledge the outer boundaries of the statute's text and purpose.  'Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be

30

a shareholder [or one who completed a bargain to become a shareholder], where the

claim lacks any causal relationship to the purchase and sale of stock and when

subordinating the claim . . . would not further the policies underlying § 510(b) . . . .'"

461 F.3d at 259, quoting *Baroda Hill Inv., Inc. v. Telegroup, Inc. (In re Telegroup,*

*Inc.)*, 281 F.3d 133, 144, n.2 (3d Cir. 2002).  Plaintiffs' attempt to subordinate

Softbank's debt claims, based solely on § 510(b), goes well beyond the outer limits of

the statute.  There is an insufficient causal relationship alleged between Softbank's

prior purchase of preferred stock and the claim it held on the date of the petition, and

subordination of Softbank's debt claim based solely on the terms of § 510(b) would

not further the policies underlying the statute.  Defendants' motion to dismiss Count

XXV of the Complaint is granted.

**B.  Fiduciary Liability As Controlling Shareholder**

Plaintiffs go one step further than subordination, seeking to impose liability on the

Softbank Defendants based upon the premise that they were controlling shareholders of

the Debtor.  Counts II and III of the Complaint seek damages for breach of the fiduciary

duty of loyalty and the fiduciary duty of care, respectively, with regard to failure to

disclose the facts relating to the Cotsakos Compensation.  Counts IX and X of the

Complaint seek damages based upon breach of the fiduciary duty of loyalty and the

fiduciary duty of care, respectively, in relation to the shutdown of MarketXT, Inc.[12]

---

[12]   It may be noted that Plaintiffs have not sued any of Softbank's officers or employees who were
directors of the Debtor and who clearly owed fiduciary duties to the Debtor.  "Softbank" (i.e., any of the
Defendants) was not a director or officer of the Debtor.  The sole issue is whether the Complaint adequately
alleges that Softbank was in the position of "controlling stockholder" so as to have fiduciary duties with
respect to the Debtor.

Under Delaware law, a claim based on control person liability must be based on

sufficient allegations of actual control.[13]  The Supreme Court of Delaware has held that

"a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises

control over the business affairs of the corporation."  *Kahn v. Lynch Communication*

*Systems, Inc.*, 638 A.2d 1110, 1113-1114  (Del. 1994); *see also Official Comm. of*

*Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 508

(S.D.N.Y. 2001).  In the present case, the Softbank companies were minority

shareholders of the Debtor, with only 24% of the common stock.  "For a dominating

relationship to exist in the absence of controlling stock ownership, a plaintiff must allege

domination by a minority shareholder through actual control of corporate conduct."

*Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989).  Thus,

control person liability in this case can only be based upon allegations of Softbank's

"actual control."

Voting power coupled with other factors has been found sufficient to make out a

case of control person liability for purposes of a motion to dismiss.  *See generally Thorpe*

*v. Cerbco, Inc.*, 676 A.2d 436 (Del. 1996).  Such control can be through actual

domination of a corporation's board of directors.  *See Kahn v. Lynch Communication*

*Systems, Inc.*, 638 A.2d at 1114-15 (43.3% minority shareholder was a controlling

shareholder due to control that designated director exercised over board of directors); *see*

*also In re KDI Holdings, Inc.*, 277 B.R. at 512; *Rosener v. Majestic Management, Inc. (In*

*re OODC, LLC)*, 321 B.R. 128, 142 (Bankr. D. Del. 2005) (sufficient facts pled to

support claim against non-officer, director or majority shareholder for breach of fiduciary

---

[13]    Delaware law is applicable to corporate organization issues such as the duties of directors, officers and
others, as the Debtor is a Delaware corporation.  *See Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y.
1998), citing *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980).

duties of loyalty and good faith; defendant was allegedly in control of debtor through

close ties with officer of debtor and preferred interest in debtor's parent).  Additionally,

control rights in a contract may contribute to a finding that an entity was a controlling

shareholder, and such rights constitute another factor that should be considered in

determining whether defendants had actual control over a company.  *See Superior Vision*

*Services, Inc. v. Reliastar Life Ins. Co.*, 2006 Del. Ch. Lexis 160, at *20 (Del. Ch. Aug.

25, 2006).

      However, where the entity allegedly in control exercises rights as a lender, other

considerations must also be taken into account.  In *Superior Vision Servs., Inc.*, the

Delaware Chancery Court dealt with a claim of control person liability against a

significant shareholder who exercised certain contractual rights and was accused of

control and breaching its fiduciary duties.  The Court stated, as a general rule, that "a

significant shareholder, who exercises a duly-obtained contractual right that somehow

limits or restricts the actions that a corporation otherwise could take, does not become,

without more, a 'controlling shareholder' for that particular purpose."  *Id.* at *20.  The

Court went on to state,

> There may be circumstances where the holding of contractual rights,
> coupled with a significant equity position and other factors, will support
> the finding that a particular shareholder is, indeed, a 'controlling
> shareholder,' especially if those contractual rights are used to induce or to
> coerce the board of directors to approve (or refrain from approving)
> certain actions.

*Id.*  But it concluded there that such a "confluence of factors is not alleged to be present

in this matter and, accordingly, ReliaStar may not fairly be deemed a 'controlling

shareholder' with respect to the payment of dividends by SVS."  *Id.*

In the present case, the "confluence of factors" relating to control and wrongdoing involved, for the most part, Softbank's exercise of its rights as a lender, its refusal to give up those rights or its collateral, and its demands for payment of overdue debt and its contractual liquidation preferences. Softbank cannot be subjected to control person liability for those actions alone. Softbank was a lender with a security interest in property of the Debtor and a large liquidation preference that carried certain powers in connection therewith. Nevertheless, there is no claim in the Complaint that Softbank's loans or liquidation preferences were usurious or illegal or that the Debtor could not have made a rational business decision to grant Softbank these rights.[14] As noted above, there is no allegation in the Complaint that Softbank used its position on the board of directors to force itself on the Debtor as a preferred stockholder or lender. On the contrary, on the allegations of the Complaint, the Debtor came back to Softbank time and again to borrow funds, with Softbank as a reluctant provider.[15]

---

[14] It should be noted that certain Counts of the Complaint seek to avoid the liquidation preferences as fraudulent conveyances, but these avoidance claims are dealt with below.

[15] Defendants further point out that they did not possess control over the Debtor as a consequence of their holding of preferred shares because under the Certificate of Designations, their consent to a transaction was unnecessary so long as the redemption of the series of preferred shares took place prior to or during a merger, consolidation or other deemed liquidation event. Specifically, Section 6(b) of the Certificate of Designations provides, in part:

> So long as any shares of any Series are outstanding, in addition to any other vote or consent of stockholders required by law, the vote or consent of the holders of at least a majority of the shares of the Series affected thereby at the time outstanding, voting separately as a single class, shall be necessary for effecting or validating . . . Any merger or consolidation of the Corporation with or into any entity other than a corporation, or any merger or consolidation of the Corporation with or into any other corporation. . . . Any Deemed Liquidation Event . . . provided, however, that no such vote or consent of the holders of the Series A or Series B shall be required if provision is made for the redemption of all outstanding shares of Series A at the Series A Liquidation Amount or for the redemption of all outstanding shares of Series B at the Series B Liquidation Amount, as the case may be, at or before the time when such . . . merger or consolidation or Deemed Liquidation Event is to take effect, as the case may be.

This redemption language is another factor in discounting any control exerted by Defendants.

34

Indeed, except as discussed below, the Complaint as a whole does not paint a picture of a lender in control but constant disputes and contentions between a borrower, controlled by Amanat, and "Softbank," as Board member, lender, shareholder and source of capital.  Plaintiffs rely on *In re KDI Holdings, Inc.*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999), where the court found that "[a]ctual fraud need not be established to satisfy this element; rather, it is sufficient to establish that control over the corporation was used 'to perpetrate the violation of a . . . positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights.'"  *Id.* at 517, quoting *Gorril v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985).  But that case, like most control cases, dealt with the question of whether the defendant, by virtue of various business or family relationships, was in "actual control" of the corporation in question.  The allegations in this case, fairly read, do not describe control but a constant series of disputes between independent entities.

Plaintiffs and Defendants both rely on the Odyssey Partners-Fleming litigation. *See Odyssey Partners, L.P. v. Fleming Co., Inc.*, 1996 Del. Ch. Lexis 91, at *11-*14 (Del. Ch. July 24, 1996) ("*Odyssey I*"), and *Odyssey Partners v. Fleming Co., Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999) ("*Odyssey II*").  Plaintiffs obviously cite the Delaware Court's denial of an initial motion to dismiss.[16]  Defendants, of course, rely on the

---

[16]   The motion Court stated:
> [O]ne who may be both a creditor and a fiduciary (e.g., a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights . . . But the obverse of this proposition is true as well; it may be the case that a creditor misuses a fiduciary position (by, for example, using confidential corporate information) to try to advantage himself in his creditor capacity.  The advantage he seeks may involve the exercise of some independent right – the right to buy something or a creditor's right under a credit agreement, for example.  In such circumstances the exercise of legal rights would not, of course, privilege the prior misuse of corporate information, which would continue to constitute a violation of fiduciary duty.

*Odyssey I*, 1996 Del. Ch. Lexis 91, at *11-*14.

decision after trial in which the Chancery Court found that the secured creditor had not

acted inappropriately. *See Odyssey II*, 735 A.2d 386. Referring to the holding of

*Odyssey I*, the Court in *Odyssey II* concluded after trial that "[f]iduciary obligation does

not require self-sacrifice. More particularly, it does not necessarily impress its special

limitation on legal powers held by one otherwise under a fiduciary duty, *when such*

*collateral legal powers do not derive from the circumstances or conditions giving rise to*

*the fiduciary obligation in the first instance.*" *Id.* at 415 (emphasis added).

        In this case, no allegations have been made that Softbank received its collateral

legal powers because of a control position. It received its most potent rights because the

Debtor desperately needed funds and could not borrow from a third party. Indeed, with

two exceptions, discussed below, the Complaint does not charge Softbank with abuse of

its minority Board position. For example, it is argued that "Softbank" was "on both

sides" of the E*Trade Merger, but there is no assertion that it used its board position to

force the Debtor into that transaction. It is true that Defendants refused to give up their

liquidation preferences and bargained to improve their position and/or get paid, but this

does not demonstrate that they controlled the Debtor. Indeed, there were constant

disputes between the Debtor, which was apparently controlled by Amanat, and Softbank,

and on the issue of control, the most salient fact is that Softbank never got either its debt

or its liquidation preferences paid in full. They are claims in the bankruptcy today.

Another one of the charges against Softbank is that it threatened to put the Debtor into

bankruptcy. Neither the threat of putting a third party into bankruptcy, nor the filing of

an involuntary petition is alone evidence of control. It may be evidence of leverage, but

any creditor has a degree of leverage. The conclusion is inescapable that, for the most

part, Defendants lacked the level of actual control necessary to give rise to control person liability.[17]

There are two possible exceptions to the conclusion that Softbank did not improperly use its Board position to dominate or control the Debtor. The first goes to the requirement that Softbank's representatives be present in order for the Board to have a quorum and be able to conduct business. In this regard, the Complaint alleges that Softbank's representatives refused to attend meetings and otherwise to perform their duties as directors unless Softbank's debt and/or liquidation preferences were paid, and that in the fall of 2002 Softbank insisted that the Debtor deal with E*Trade before dealing with its other problems and creditors.

When read together, these allegations, particularly those regarding Board meetings, go directly to the issue of abuse of a control position and use of "contractual rights . . . to induce or coerce the Board of Directors to approve (or refrain from approving) certain action." *Superior Vision Services, Inc. v. Reliastar Life Ins. Co.*, 2006 Del. Ch. Lexis 160, at *20. As the Delaware Court held there, such an exercise of power could render a party a "controlling shareholder" for that particular purpose. However, in order to make out such a claim, a complaint must at a minimum allege facts to demonstrate harm and damage with respect to the particular wrong. According to the Complaint, the Debtor and its subsidiaries were out of money, and Plaintiffs cannot seriously contend that Softbank had an obligation to lend more. The Debtor's suggestion that Softbank was under a duty to make the E*trade shares that served as its collateral

---

[17]   It should be noted that in a separate adversary proceeding related to this chapter 11 case, the Trustee obtained an affidavit from Amanat in which he admitted, among other things, that he intended to hinder, delay and defraud creditors of Market XT Holdings (such as Softbank) with respect to the STARS transaction. *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 336 B.R. 39, 46-49 (Bankr. S.D.N.Y. 2006).

available for general corporate purposes is not viable.  Nevertheless, MarketXT was

caught in a liquidity squeeze, and if Softbank's alleged refusal to attend Board meetings

can be shown to have been a contributing cause to the Debtor's inability to deal with it, a

claim could be stated against Softbank.  In light of the contentions that have been made,

the Court will give Plaintiffs an opportunity to amend their Complaint to allege harm and

damages as a result of Softbank's refusal to attend Board meetings and its demand that

the Debtor first deal with the E*Trade dispute before dealing with the MarketXT liquidity

issues.

      The second possible exception to the conclusion that Softbank was not in a

control position vis a vis the Debtors relates to the issue of the Cotsakos Compensation.

It is alleged that "Softbank" had representatives on both the MarketXT and E*Trade

boards and that it had a consequent duty to disclose what its representatives on the

E*Trade Board allegedly knew about the Cotsakos matter.  Plaintiffs rely heavily on

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983), and *Lynch v. Vickers Energy Corp.*,

383 A.2d 278 (Del. 1977), to support their argument that the alleged failure of the

Softbank entities to disclose the Cotsakos Compensation breached a fiduciary duty of

disclosure.  *Weinberger v. UOP, Inc.* dealt with a cash-out merger transaction in which

the acquiring company was a majority shareholder of the target company and designated

six of its directors.  A material study was compiled at the direction of the acquiring

company and was actually drafted by officers of the acquiring company who also served

as directors of the target.  The study was withheld from the minority shareholders of the

target company in connection with a vote in favor of the merger.  In finding that non-

disclosure of the information amounted to a breach of fiduciary duty, the Court stated

38

> [g]iven the absence of any attempt to structure this transaction on an arm's
> length basis, Signal cannot escape the effects of the conflicts it faced,
> particularly when its designees on UOP's board did not totally abstain
> from participation in the matter.  There is no 'safe harbor' for such divided
> loyalties in Delaware.  When directors of a Delaware corporation are on
> both sides of a transaction, they are required to demonstrate their utmost
> good faith and the most scrupulous inherent fairness of the bargain . . .
> There is no dilution of this obligation where one holds dual or multiple
> directorships, as in a parent-subsidiary context.  Thus, individuals who act
> in a dual capacity as directors of two corporations, one of whom is parent
> and the other subsidiary, owe the same duty of good management to both
> corporations, and in the absence of an independent negotiating structure . .
> . or the directors' total abstention from any participation in the matter, this
> duty is to be exercised in light of what is best for both companies.

*Id.* at 710-11.  Similarly, in *Lynch v. Vickers Energy Corp.*, defendants were in control of the acquiring company and directors of the target company, with first-hand knowledge of the information withheld from the target.

The flaw in Plaintiffs' argument is that in both *Weinberger* and *Lynch*, defendants unquestionably owed fiduciary duties to the target corporation and were also clearly on both sides of a transaction.  Here, as discussed above, "Softbank" did not owe the Debtor the overall fiduciary duties imposed on a controlling shareholder, nor are there sufficient allegations of its control relative to the E*Trade merger as to render it a controlling shareholder on that issue.  Plaintiffs assert,

> Softbank was very eager to see E*Trade emerge as the winning bidder for
> Momentum, because that would strengthen one of Softbank's key business
> partners world-wide and also allow for Momentum's extremely valuable
> trading technology platform to be made available for use in all of the
> Softbank/E*Trade joint ventures.

(P's Opp'n p. 18.)  Be that as it may, any such "eagerness" on Softbank's part does not amount to an adequate allegation of control.  Nor has it been argued that "Softbank" was in control of E*Trade.  Thus, it cannot be said that Softbank was on "both sides of the transaction" within the meaning of cases such as *Weinberger* and *Lynch*.  The allegations

in the Complaint are too remote to impose on Defendants a broad duty of disclosure with respect to the Cotsakos Compensation, and the motion to dismiss is granted with respect to Counts II and III, which assert a breach of fiduciary duty with respect thereto.

## C. Actual Fraudulent Conveyance

Counts IV, XI and XII of the Complaint seek avoidance of transfers made under the Softbank Lock-up Agreement and the Softbank Payoff Agreement, as well as avoidance of the Softbank Payoff Agreement itself, as intentional fraudulent conveyances under § 548(a)(1)(A) of the Bankruptcy Code and §§ 276 and 276-a of NYDCL.

Section 548(a)(1)(A) of the Bankruptcy Code[18] and § 276 of NYDCL,[19] which is made applicable through Bankruptcy Code § 544(b), provide that a trustee may avoid transfers of a debtor's interest in property made with actual intent to hinder, delay or defraud creditors. Under the Bankruptcy Code, the plaintiff must establish the actual fraudulent intent of the transferor/debtor; under the NYDCL the plaintiff must establish the actual fraudulent intent of both the transferor and the transferee. *See Picard v. Taylor (In re Park South Securities, LLC)*, 326 B.R. 505, 517 (S.D.N.Y. 2005), citing *Manhattan Inv. Fund, Ltd. v. Bear Stearns Sec. (In re Manhattan Inv. Fund, Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002).

As previously noted, under F.R. Civ. P. 9(b), made applicable by Rule 7009 of the Federal Rules of Bankruptcy Procedure, an allegation of actual fraud must be pled with

---

[18]   Section 548(a)(1)(A) of the Bankruptcy Code provides that a "trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily (A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became . . . indebted . . . ."

[19]   Section 276 of NYDCL provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Section 276-a of NYDCL further provides for recovery of attorneys' fees in an action to set aside a conveyance made with actual intent to defraud.

particularity.  "The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005), quoting *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1128 (2d Cir. 1994).  However, courts take a more liberal view when examining allegations of actual fraud that are pled by a bankruptcy trustee in the context of a fraudulent conveyance, since "a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge."  *In re Park South Securities, LLC*, 326 B.R. at 517-18.  In such circumstances, courts will allow allegations of circumstantial evidence to establish fraudulent intent, such as the well-established "badges of fraud."  *Id.*

Even if Plaintiffs are relieved of some of the rigors of Rule 9(b), they still must plead the intent of the transferor (under the Bankruptcy Code) and the intent of the transferor and transferee (under NYDCL).  With respect to the intent of the transferor, plaintiffs do not seriously argue that the allegations of the Complaint support the contention that in its dealings with Softbank, the Debtor intended to "hinder, delay or defraud" MarketXT's other creditors.  Instead, Plaintiffs made a two-step argument.  First, Plaintiffs argue that "the Amended Complaint sets forth Softbank's intent to hinder or delay the Debtor's creditors in tremendous detail."  (P's Opp., p. 22.)  Second, Plaintiffs then assert that Softbank's intent can be imputed to MarketXT as a consequence of Softbank's "control" over the Debtor.

There is little or no support for the proposition that a creditor's insistence on its right to payment constitutes a *prima facie* scheme to "hinder or delay" other creditors

within the meaning of the fraudulent conveyance laws.[20]  In any event, intent of the

transferee is imputed to the transferor only where the transferee is in a position to control

"the debtor's disposition of his property."  *Jackson v. Mishkin (In re Adler, Coleman*

*Clearing Corp.)*, 263 B.R. 406, 443 (S.D.N.Y. 2001), citing 5 King, *et al.*, *Collier on*

*Bankruptcy* ¶ 548.04[1], at 548-24.  As previously discussed, the Complaint's allegations

are not generally adequate on the issue of control, and Plaintiffs certainly have not

adequately pled that Softbank was able to control the Debtor's disposition of its property.

Just the opposite seems to have occurred, with defaults on the part of the Debtor and

collection actions by Softbank.

     The "badges of fraud" on which Plaintiffs rely to demonstrate the parties' "actual

fraudulent intent" are also inadequate.  Badges of fraud include:

> (1) the lack or inadequacy of consideration; (2) the family,
> friendship or close associate relationship between the parties; (3)
> the retention of possession, benefit or use of the property in
> question; (4) the financial condition of the party sought to be
> charged both before and after the transaction in question; (5) the
> existence or cumulative effect of a pattern or series of transactions
> or course of conduct after the incurring of debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; and (6) the
> general chronology of the events and transactions under inquiry.

*Le Café Crème, Ltd. v. Le Roux (In re Café Crème, Ltd.)*, 244 B.R. 221, 239 (Bankr.

S.D.N.Y. 2000), quoting *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir.

1983); *see also Breeden v. L.I. Bridge Fund, L.L.C. (In re The Bennett Funding Group,*

*Inc.)*, 220 B.R. 743, 755 (Bankr. N.D.N.Y. 1997).  Here, there were no familial or

---

[20]   The only case Plaintiffs cite for the proposition that a secured creditor can hinder or delay others by
asserting its rights is *European Am. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*,
158 B.R. 926, 938 (Bankr. S.D.N.Y. 1993).  The avoidance claim there was an additional cause of action
that involved a foreclosure sale that took place minutes before a bankruptcy filing, and the Court dealt with
the fraudulent conveyance allegations very summarily.  Unsure whether the lender had even moved to
dismiss the avoidance counterclaim, the Court merely held that relief would be premature in light of
disputed facts.

personal relationships between the parties; on the contrary, the allegations of the Complaint evidence an adversarial or at least an arm's length relationship. Nothing was done in secret. The allegations that the transfers at issue lacked adequate consideration are discussed below in connection with the counts claiming constructive fraud. It is alleged that Softbank demanded payment in full in preference to other creditors and engaged in a series of transactions, including the Lock-up and Payoff Agreements, to obtain payment. (Compl. ¶¶ 165, 187, Ex. 11(i), 11(g), 11(k).) However, these allegations do not support a claim of intent to defraud. For purposes of the actual fraud causes of action, the Complaint fails to allege sufficiently specific facts to support the proposition that the transfers to Softbank were intentionally fraudulent. The motion to dismiss is granted with respect to Count IV of the Complaint.

At the argument of the motion to dismiss, Plaintiffs' counsel contended that actual fraudulent intent can be demonstrated through one provision in the Softbank Payoff Agreement. It was noted that in the last sentence of section 1(b) of the Payoff Agreement, the parties agreed that "Omar Amanat's T Corp. preferred shares will receive distributions and be canceled and redeemed on a *pari passu* basis with Softbank." Plaintiff's counsel appears to interpret this provision, in conjunction with the provision governing payment of Softbank's liquidation preference, as indicating collusion.[21] This claim was not asserted in the Complaint, which as noted must allege intentional fraud with particularity. Softbank also did not have a reasonable opportunity to respond to it. Under the circumstances, the Court will give Plaintiffs an opportunity to amend their

---

[21]  Counsel stated that "Softbank says for your troubles, Amanat, we'll let you get paid your liquidating preferred the same time we get paid on all our liquidating preferred, which you do the math is clearly ahead of all of the creditors of the company. So, Your Honor, there is clearly an intention on the part of both Softbank and the company to get paid on their equity before creditors of the company get paid. You want to call it fraud, fine. You want to call it intent to hinder or delay the other creditors, I think it's more than hinder or delay, but it's at least hinder and delay." (Hr'g Tr. 68: 3-12, July 6, 2006.)

Complaint to allege (with particularity) actual fraud with respect to the terms of the

Softbank Payoff Agreement, but the allegations heretofore asserted in Counts IV, XI and

XII of the Complaint are dismissed.

## D.  Constructive Fraud

Unlike claims of actual fraud, claims of constructive fraud do not rest on the issue

of intent but on transfers for less than fair value made at a time when the transferor was

insolvent or undercapitalized or unable to pay its debts as they matured.  Under the

Bankruptcy Code, as applicable to this case filed before the 2005 amendments, the "look-

back" period for avoiding transfers is one year prior to the date of the filing of the initial

involuntary petition on March 26, 2004 – i.e., March 26, 2003.  Under applicable (*i.e.*,

New York) state law, made applicable in bankruptcy cases pursuant to 11 U.S.C. §

544(b), the look-back period is six years.  Counts V, VI, and VII of the Complaint seek

avoidance and recovery of the transfers made under the Softbank Lock-Up Agreement of

July 25, 2002, as constructive fraudulent conveyances pursuant to §§ 273, 274, and 275

of NYDCL, respectively.  Counts XIII, XIV, and XV of the Complaint seek avoidance of

the Softbank Payoff Agreement and Release, dated January 27, 2003, and the transfers

made thereunder, as constructive fraudulent transfers pursuant to the same authority.

Count XVI of the Complaint seeks avoidance of the payments made in April 2003 by the

Debtor on the January and March 2003 Notes pursuant to § 548(a)(1)(B) of the

Bankruptcy Code.[22]

---

[22]   It should be noted that Defendants have not moved to dismiss the following counts of the Complaint that also seek to avoid certain transfers: Count XVII, claiming that the $11.6 million payment on April 9, 2003 was a preference paid to an insider under § 547 of the Bankruptcy Code; and Counts XX, XXI and XXII seeking to avoid the transfers made under the Preferred Stock Agreement whereby Softbank received liquidation preferences totaling $18 million in return for a $5 million equity investment.

On this motion to dismiss, Defendants do not challenge the Complaint's allegation that the Debtor was insolvent, or unable to pay its maturing debts, as early as mid-February 2001. Defendants' principal contention is that the Debtors received fair consideration, since the Softbank Lock-Up Agreement and the Softbank Payoff Agreement merely secured a legitimate antecedent debt. Plaintiffs counter that fair consideration was lacking because the transfers were not made in good faith as required under § 272 of the NYDCL.

Under the NYDCL, a constructive fraudulent conveyance is a transfer made or an obligation incurred without "fair consideration" by a person or entity: (i) that is or will be thereby rendered insolvent, (ii) that is engaged or is about to engage in a business or transaction for which his remaining property after the conveyance is an unreasonably small capital, or (iii) that intends or believes that it will incur debts beyond his ability to pay as they mature. NYDCL §§ 273, 274, 275. Under § 272 of NYDCL, fair consideration is given in exchange for property or an obligation "when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or when such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." The definition of fair consideration under §272 therefore contains an element of good faith.

Federal law is similar. Section 548(a)(1)(B) provides that a transfer made within one year of a debtor's petition date may be avoided if such transfer was made for less than reasonably equivalent value and at the time of the transfer the debtor was insolvent, had an unreasonably small capital or incurred or believed it would incur debts beyond its

45

ability to pay. Unlike the NYDCL, however, § 548 does not require the proponent to

deal with the issue of good faith, although good faith is an affirmative defense under

certain circumstances. 5 King, et al., *Collier on Bankruptcy* ¶ 548.05(1)(b) (15th ed. rev.

2006).

Defendants are correct to the extent they contend that the Softbank Lock-Up

Agreement and Softbank Payoff Agreement were not constructive fraudulent

conveyances merely because they secured antecedent debts. There is no dispute that the

Softbank Lock-Up Agreement was entered into, *inter alia*, to secure the August 2000

Note, the May 2002 Note and the liquidation preferences. The Softbank Payoff

Agreement settled litigation relating to the August 2000 Note and also provided security

for antecedent debt. The cases are uniform that the grant of collateral for a legitimate

antecedent debt is not, without more, a constructive fraudulent conveyance. This

conclusion is based in part on § 548(d)(2) of the Bankruptcy Code, which defines value

as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . .."

Thus, the federal cases hold that a grant of collateral together with forbearance constitutes

reasonably equivalent value. *See Cuevas v. Hudson United Bank (In re M. Silverman*

*Laces, Inc.)*, 2002 U.S. Dist. Lexis 20288, *15-*16 (S.D.N.Y. 2002) (stating that debtor

"received 'value' when its antecedent debt was extended and collateralized.");[23] *Anand v.*

*National Republic Bank of Chicago*, 239 B.R. 511, 517-18 (N.D. Ill. 1999); *In re Ward*,

36 B.R. 794, 799 (D.S.D. 1984). New York law is the same. *See In re Kaplan Breslaw*

---

[23] In the *Silverman* case, the Court specifically noted that the debtor, Silverman, was in default, and that
the lender, HUB, could have demanded immediate payment or taken other steps to collect on the debtor's
obligations. *Silverman*, 2002 U.S. Dist. Lexis 20288, *15. "Instead, HUB waived its rights to immediately
pursue its remedies and it agreed to extend Silverman's obligations. In return, Silverman gave HUB a
security interest in its inventory, but this collateral was being given for the extension of the loans and
HUB's agreement to forbear from pursuing its remedies. Although the inventory was worth more than twice
the amount of the debt Silverman owed to HUB, HUB could recover against the inventory only to the
extent of Silverman's defaulted obligations and thus any inventory beyond that would remain Silverman's
property." *Id.* at *15-*16.

*Ash, LLC*, 264 B.R. 309, 328 (Bankr. S.D.N.Y. 2001) ("[W]hile the Uniform Fraudulent

Conveyance Act, implemented in New York's DCL, speaks in terms of 'fair

consideration' instead of reasonably equivalent value, 'fair consideration is given in

exchange for property or an obligation when 'as a fair equivalent therefor, and in good

faith, property is conveyed or an antecedent debt is satisfied' or when it is 'received in

good faith to secure a present advance or antecedent debt in amount not

disproportionately small' to the value of the property transferred or obligation

incurred.'") (internal citations omitted).

Nevertheless, application of these principles does not justify granting Softbank's

motion to dismiss.  First, Plaintiffs seek to avoid more than a grant of collateral to secure

a legitimate antecedent debt.  For example, the Softbank Payoff Agreement included a

release of all the Debtor's claims up to the date of the closing of the Agreement.  A

release obtained for less than fair value can constitute a constructive fraudulent

conveyance.  *See generally Buncher Co. v. Official Comm. of Unsecured Creditors of*

*Genfarm Ltd. P'ship IV*, 229 F.3d 245 (3d Cir. 2000) (in context of Pennsylvania

Uniform Fraudulent Conveyance Act, release of claims in a settlement did not constitute

fair consideration).

The second reason for denying the motion to dismiss the counts claiming

constructive fraud is the requirement under New York law that the "fair consideration" be

conveyed in good faith.  *See* NYDCL § 272.  The Second Circuit has held that good faith

"is an elusive concept in New York's constructive fraud statute.  It is hard to locate that

concept in a statute in which 'the issue of intent is irrelevant.'"  *Sharp Int'l Corp. v. State*

*Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005).

Nevertheless, as the Court held there, there is "one exception" to the rule that the

repayment of an antecedent debt constitutes fair consideration: where "the transferee is an officer, director, or major shareholder of the transferor." *Id.*, quoting *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987). It has frequently been held that transfers made by an insolvent corporation "to an officer, director or major shareholder of that corporation are per se violative of the good faith requirement of DCL § 272 and the fact that the transfer may have been made for a fair equivalent is irrelevant." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 172 (Bankr. S.D.N.Y. 1998), citing *Allen Morris Commercial Real Estate Services Co. v. Numismatic Collectors Guild, Inc.*, 1993 U.S. Dist. Lexis 7052, at *29 (S.D.N.Y. May 27, 1993); *In re Checkmate Stereo and Electronics, Ltd.*, 9 BR. 585, 617 (Bankr. E.D.N.Y. 1982), *aff'd*, 21 B.R. 402 (E.D.N.Y. 1982); *Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000).

Softbank argues that it did not "control" the Debtor and that the "insider" exception is not applicable to it. However, there is no indication that the cases require, in determining good faith for purposes of NYDCL § 272, the same degree of pervasive control that the Delaware courts require for imposing fiduciary duties on a "controlling shareholder" and rendering the shareholder liable in damages for breach of those duties. As discussed above, Softbank was an "insider" as defined in the Bankruptcy Code, and its actions are subject to more searching scrutiny for equitable subordination purposes. As the holder of 24% of the Debtor's shares, it would appear to have been a "major shareholder" as that term was used by the Second Circuit in *Sharp*. The facts may demonstrate that Softbank acted in good faith in connection with the claimed fraudulent transfers, but those facts are hotly contested and cannot be determined on a motion to

dismiss.  Softbank's motion to dismiss the constructive fraud counts of the Complaint is
denied.[24]

**E.  <u>Duress</u>**

Counts VIII and XVIII of the Complaint seek a declaratory judgment that the
Softbank Lock-up Agreement and the Softbank Payoff Agreement are voidable as
products of undue duress.  The Complaint alleges that the Debtor was forced to enter into
these agreements as a result of its economic prostration and alleged inability to access
other sources of capital, as well as by threats of physical harm against Amanat and his
wife allegedly made by Takeuchi.

Under New York law, a contract may be voided on the ground of duress if the
moving party proves it was involuntarily forced to enter the contract as a result of "a
wrongful threat precluding the exercise of ... free will."  *Warnaco, Inc. v. Farkas,* 872
F.2d 539, 546 (2d Cir. 1989), quoting *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d
124, 130, 272 N.E.2d 533, 324 N.Y.S.2d 22 (1971); *see also VKK Corp. v. National*
*Football League*, 244 F.3d 114, 122 (2d Cir. 2001), quoting *DiRose v. PK Mgmt. Corp*.,
691 F.2d 628, 633 (2d Cir. 1982), cert. denied, 461 U.S. 915 (1983).  "The doctrine of
economic duress arises from the theory that 'the courts will not enforce an agreement in
which one party has unjustly taken advantage of the economic necessities of another and
thereby threatened to do an unlawful injury.'"  *VKK Corp*., 244 F.3d at 122, quoting
*Scientific Holding Co. v. Plessey Inc*., 510 F.2d 15, 22 (2d Cir. 1974).

---

[24]   Count XVI is a constructive fraudulent conveyance count based on the Bankruptcy Code, in which the
issue of good faith is an affirmative defense to be raised by the defendant.  However, the count involves the
payment of $11.6 million to Softbank in April 2003, not the collateralization of a valid antecedent debt.
Based on the results of the Trustee's other avoidance claims, he may be able to avoid this payment as well,
and the motion to dismiss this Count is denied.

On the other hand, the cases are clear that invalidation of a contract on grounds of economic duress should take place only in "extreme and extraordinary cases." *VKK Corp.*, 244 F.3d at 123. Evidence of economic disadvantage is inadequate to make a case of duress; since "an element of economic duress is . . . present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases. Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the contract or release challenged long after the instrument became effective." *VKK Corp.*, 244 F.3d at 123. Thus, it must be shown that the disadvantaged party was deprived of its free will and that the usual remedy of an action for rescission or for breach of contract would be inadequate to remedy the situation. *Davis & Assocs. v. Health Mgmt. Servs.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001), quoting *Berman v. Parco*, 1996 U.S. Dist. Lexis 11921, *22, No. 96 Civ. 0375 (KMW) (S.D.N.Y. August 15, 1996). It is also "axiomatic" that parties cannot be guilty of economic duress "for failing to grant further forbearance when they had no legal duty to do so." *Davis*, 168 F. Supp. 2d at 114. Duress by its definition constitutes a wrongful act, and a wrongful act cannot ordinarily result from a party exercising its legal rights.

The incidents of pressure asserted in the Complaint do not generally rise to the level of wrongful conduct necessary to support a claim of economic duress. For example, Softbank may have taken advantage of the Debtor's need for capital and may have used its leverage to lock up the E*Trade stock. However, a sophisticated party must support a claim for economic duress by more than the claim that the defendant knew of and used the plaintiff's poor financial condition to obtain an advantage in negotiations. *Davis*, 168 F. Supp. 2d at 114, quoting *Dufort v. Aetna Life Ins.*, 818 F. Supp. 578, 581 (S.D.N.Y.

50

1993).  There is no allegation that the Debtor was placed in such a dire situation as to be

precluded from exercising its free will.  "Although 'there is no line of absolute

demarcation' between a threat that deprives a party of its free will as opposed to a threat

that portends some lesser degree of harm, any 'finding of duress at least must reflect a

conviction that one party to a transaction has been so improperly imposed upon by the

other that a court should intervene.'"  *Davis*, 168 F. Supp. 2d at 116, quoting *Hellenic*

*Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967).  The allegations of

the Complaint, assumed to be true, do not demonstrate that the Debtor had no alternative,

at any time, than to accede to Softbank's demands.  For example, the Debtor could have

chosen to file for bankruptcy at an earlier point.[25]

For this reason, even the allegation of a verbal threat of harm fails to meet the

necessary standard of duress.  Indeed, if there had been a credible threat of physical harm,

Mr. Amanat had legal remedies available to him, including contacting the authorities to

report the alleged threats.  *Davis*, 168 F. Supp. 2d at 117; *see also Durante Bros. & Sons,*

*Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir. 1984) ("In order to prevail on

such a claim [of economic duress] the plaintiff must show, *inter alia*, that it had available

no legal remedies to avoid the duress"); *Nelson v. Blacker*, 713 F. Supp. 107. 109

(S.D.N.Y. 1989); *Mathis v. Jacobs*, 167 F. Supp. 2d 606, 613-15 (S.D.N.Y. 2001).

Furthermore, even if the Lock-Up and Payoff Agreements were adequately

alleged to have been the result of duress, there is no question on this motion to dismiss

that the Debtor delayed in repudiating the contracts.   "'[A] person claiming duress must

---

[25]    Indeed, as noted above, it is claimed that Softbank threatened to put the Debtor in bankruptcy.  To
commence a legal action on behalf of all creditors, which would possibly have given the Debtor time to
restructure its finances, is not evidence of duress but the opposite.  The Debtor could also have brought suit
earlier to repudiate the contract and rectify the situation, as further discussed below.  *See Teachers Ins. &*
*Annuity Ass'n v. Wometco Enters.*, 833 F. Supp. 344, 349, n.7 (S.D.N.Y. 1993).

act promptly to repudiate the contract or release or he will be deemed to have waived his

right to do so.'" *VKK Corp.*, 244 F.3d at 122, quoting *DiRose*, 691 F.2d at 633-34; *see

also Scientific Holding Co.*, 510 F.2d at 23; *International Halliwell Mines, Ltd. v.

Continental Copper and Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir. 1976).  A delay of

six months has been found to constitute a forfeiture.  *See DiRose*, 691 F.2d at 634.  A

failure to promptly repudiate a contract entered into under duress will be deemed a

ratification of that contract.  *VKK Corp.*, 244 F.3d at 122-23.  Ratification can also occur

through "'intentionally accepting benefits under the contract,' by 'remaining silent or

acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or

by 'acting upon it, performing under it, or affirmatively acknowledging it.'"  *VKK Corp.*,

244 F.3d at 123, quoting *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989).

Plaintiffs argue that the Debtor repudiated the Payoff Agreement by filing an action in

District Court, in which the Debtor claimed it had improperly been forced into signing

the Softbank Payoff Agreement.  This, however, took place more than a year after the

Payoff Agreement had been entered into and did not involve, in any event, the Lock-up

Agreement.

Plaintiffs argue that repudiation will be considered timely when a victim of

continual duress waits for such duress to end before repudiating the agreements, as

continuing duress will excuse prompt repudiation.  *See Austin Investments, Inc. v. Loral

Corp.*, 29 N.Y.2d 124, 133, 272 N.E.2d 533,537, 324 N.Y.S.2d 22, 28 (1971).  But the

"continued duress" on which Plaintiffs rely was not pressure (economic or otherwise) but

the Debtor's hope that Softbank would use its influence with E*Trade for the Debtor's

benefit.  Thus, Plaintiffs concede, "[t]he Debtor believed that Softbank's influence with

E*Trade could facilitate a global settlement relating to, *inter alia*, the substantial earn-out

compensation to which the Debtor was entitled under the Merger Agreement, which, if

paid, would have relieved much of the Debtor's financial strain." (P's Reply p. 46.) This

is not a pleading of duress prior to entry into the Softbank Lock-Up and Payoff

Agreements. This is an acknowledgement that the Debtor ratified the Agreements

between the parties and continued to honor them so as to obtain benefits from Softbank's

connections with E*Trade. The motion to dismiss is granted with respect to Counts VIII

and XVIII of the Complaint.

## F. Promissory Estoppel

Count I of the Complaint seeks recovery from Defendants under a theory of

promissory estoppel based upon the Debtor's reliance on an alleged 1999 promise of

Softbank Corp. and Softbank Finance Japan and their agents, Son, Fisher, Takeuchi and

Kitao, that if E*Trade did not honor its commitment to purchase the Debtor, then

Softbank Finance Japan would buy the Debtor for $326 million.

Under New York law, the elements of promissory estoppel are "(1) a clear and

unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3)

injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611,

615 (2d Cir. 2000).[26] The Complaint fails to adequately allege a clear and unambiguous

---

[26] For purposes of this motion, both parties fully briefed New York law as applicable to the common law
causes of action such as duress and promissory estoppel. In the motion to dismiss, Defendants also make
reference to a statute of limitations argument under Japanese law and contend that

> [t]he law applicable to this claim depends in large part on where the relevant
> communications are said to have occurred. If the Plaintiffs are relying on
> communications that occurred in Japan, the cause of action for promissory estoppel fails
> to state a claim because any such claim expired in January 2005 under the five year
> period of 'extinctive prescription' in Japanese commercial law. (Mtn. to Dismiss p. 26.)

Plaintiffs, however, cite to paragraphs 76, 79, 81 and 82 of the Complaint and note that "Japanese law does
not apply here because the acts and promises that are the basis for this claim were primarily made in the
United States." (Opp. p. 34.) Plaintiffs further note that § 108(a) of the Bankruptcy Code provides that "[i]f
applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and
such period has not expired before the date of the filing of the petition, the trustee may commence such
action only before the later of (1) the end of such period . . . , or (2) two years after the order for relief."
The objection to Softbank's Claims was filed on November 23, 2005 and the adversary proceeding was

promise on which the Debtor could have reasonably and foreseeably relied. First, the

Complaint fails to offer any substance concerning the alleged promise, or even the date

when it was made. (Compl. ¶¶ 79-82). *See James v. Western New York Computing

Systems, Inc.*, 273 A.D. 2d 853, 710 N.Y.S. 2d 740 (4th Dept. 2000) (terms of oral

agreement were not specific on several topics, making promise not sufficiently clear and

unambiguous enough to plead promissory estoppel requirements.) Plaintiffs attach to the

Complaint a draft Option Agreement for an acquisition of the Debtor by Softbank. (Ex.

18.) Even granting the fact that there is a clause in the draft providing the Debtor with

the right to "put" the company to Softbank, the agreement was never signed and was in

any event subject to due diligence. The fact that a written agreement was drafted and

made subject to due diligence counters the position of Plaintiffs that there was an oral

deal on which the Debtor could have reasonably relied.[27]

Thus the reliance alleged in the Complaint cannot be viewed as reasonable and

foreseeable on the part of the promisee. "In assessing the reasonableness of a plaintiff's

alleged reliance, [the Court is] to consider the entire context of the transaction, including

factors such as its complexity and magnitude, the sophistication of the parties, and the

content of any agreements between them." *DDCLAB Ltd. v. E.I Du Pont De Nemours &

Co.*, 2005 U.S. Dist. Lexis 2721, at *18 (S.D.N.Y. Feb. 18, 2005). As Defendants note,

the parties here memorialized lesser agreements in great detail and recognized that they

had no effect until signed. Both sides were sophisticated business entities. If the Debtor

decided not to pursue deals with Childs and Ameritrade in reliance on the possibility of a

purchase by Defendants, it took the risk that a transaction with Softbank would come to

---

commenced on December 6, 2005. Both of these dates are within two years of March 26, 2004, when the
bankruptcy proceeding was commenced, and that date was prior to January 2005. Defendants do not offer
a response to these arguments.

[27] Defendants dispute the contention that the draft agreement was from their counsel.

naught.  Even assuming the truth of the allegations set forth in the Complaint, on this

motion to dismiss, reliance on the conversations set out in the Complaint must be deemed

unreasonable considering the magnitude and breadth of the transaction and the

consideration involved.

The cases cited by Plaintiffs are easily distinguished from the case at hand.

Plaintiffs rely on *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99 Civ. 2638, 1999 WL

1277243 (S.D.N.Y. Dec. 30, 1999), *Esquire Radio & Elecs. Inc., v. Montgomery Ward &

Co.*, 804 F.2d 787 (2d Cir. 1986) and *Richter v. Zabinsky*, 257 A.D. 2d 397, 683 N.Y.S.

2d 65 (N.Y. App. Div. 1999), for the position that evidence of an oral assurance in

combination with conduct to support such assurance is the only thing necessary to

establish the first element of promissory estoppel.  These cases, however, relate to the

manner of performance of a written or undisputed oral promise that was already in

existence.  In this case, the promise is vague and the reliance must be deemed

unreasonable based on the pleadings.  Plaintiffs have failed to allege facts necessary to

support a case for promissory estoppel, and the motion to dismiss is granted with respect

to Count I of the Complaint.

## G.  <u>The Binding Effect of the Softbank Payoff Agreement and Release</u>

Defendants move to dismiss Counts I, II, III, VI, IX and X of the Complaint as

barred by a release contained in Section 4(b) of the Softbank Payoff Agreement (the

"Release"), since the conduct related to these Counts is alleged to have occurred before

April 2003, which is when the Release took effect.  Plaintiffs attack the Release on the

ground that it was entered into without proper authorization, was *ultra vires* and was

intended to cover only claims relating to certain specific litigation.

Lack of Authority

Count XIX of the Complaint seeks a declaratory judgment that the Softbank

Payoff Agreement and Release is not binding on the Debtor because at the time it was

signed, Amanat had resigned as an officer and director and lacked authority to bind the

Debtor, and that in any event the Agreement was never approved by the Debtor's Board.

Defendants counter that Amanat did not comply with the requirements of Delaware law

in tendering his resignation, and that he was in any case still acting as the chief executive

officer of the Debtor with authority to bind the Company.

It does not appear contested that the resignation tendered by Amanat was initially

transmitted in the form of an email sent on November 26, 2002.  The email stated that

Amanat was giving 60 days' notice of his resignation as provided in his employment

agreement and was also resigning as a member of the Board.  (Compl. Ex. 47.)  Under

the terms of the resignation it would have become effective shortly before the date of the

Payoff Agreement.  Defendants argue, nevertheless, that the resignation was not effective

because it was not in writing and that in any event Amanat had apparent and actual

authority to bind the Debtor.

The extent and nature of Amanat's authority to bind the Debtor during the period

after January 25, 2003 cannot be determined on this motion to dismiss.  There seems little

doubt that even if Amanat purported to resign as an officer, he still controlled the Debtor.

Amanat made the decision to withdraw the Debtor's opposition to the involuntary

bankruptcy petition in 2004, after directing opposition to the petition for more than eight

months.  *See* Mot. (I) to Dismiss Involuntary Pet. and for Costs, Attorneys' Fees and

Damages in Connection Therewith, or (ii) for Abstention, Case No. 04-12078, Docket

No. 36.  Nevertheless, taking the allegations of the Complaint as true, Amanat had

tendered his resignation, Softbank was aware of this and also was aware that the Board

had not approved the release.  The facts as to Amanat's authority and lack of Board

authorization cannot be determined on this motion, and the motion to dismiss Count XIX

is denied.[28]

*Ultra Vires*

Plaintiffs also raise for the first time in their memorandum in opposition to the

motion to dismiss the argument that the Softbank Payoff Agreement was *ultra vires* and

in violation of Title 8 of the Delaware Code § 160[29] or, alternatively, New York BCL §

513.[30]  These provisions prohibit corporations from redeeming stock or exchanging stock

for debt if the corporation is insolvent or will thereby be rendered insolvent.  Defendants

admit that the Complaint raises factual issues relating to the Debtor's insolvency at the

time the Softbank Payoff Agreement was entered into and the preferred stock was

redeemed.  (Def's Reply Memorandum p. 32.)  However, Defendants argue that the

alleged receipt of fair consideration or reasonably equivalent value, and the release itself,

obviate any argument relating to whether the Softbank Payoff Agreement was *ultra vires*.

---

[28] 8 Del. C. § 142(b) provides, in part, that "[a]ny officer may resign at any time upon *written notice* to the corporation." (emphasis added).  By contrast, the corresponding section of the Delaware Code relating to the resignation of corporate directors, 8 Del. C. § 141(b), states, in relevant part, that "[a]ny director may resign at any time upon notice given in writing or by electronic transmission to the corporation."  8 Del. C. § 232(c) defines an electronic transmission as "any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process."  Section 141(b) originally required that a director give written notice of his or her resignation, but was amended in 2000 to allow for a written or electronic transmission of resignation.  *See* Del. Legis. 343 (2000).  Since the motion to dismiss Count XIX must be denied in any event, it need not be determined at this time whether Amanat's resignation was ineffective because initially transmitted by email.

[29] 8 Del. C. § 160 states, in part, "that no corporation shall (1) [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation."

[30] The New York BCL § 513(a) states, in part, that "the shares of a corporation may not be purchased by the corporation, or, if redeemable, convertible or exchangeable shares, may not be redeemed, converted or exchanged, in each case for or into cash, other property, indebtedness or other securities of the corporation . . . if the corporation is then insolvent or would thereby be made insolvent.  Shares may be purchased or redeemed only out of surplus."

The Court finds that these issues cannot be decided on a motion to dismiss, but the claims that the Softbank Payoff Agreement was *ultra vires* must be formally incorporated in the Complaint if they are to be pursued.  Plaintiffs may have leave to amend the Complaint to assert these claims relative to the Payoff Agreement.

<u>Scope of Release</u>

Defendants are on stronger ground as to the scope of the release, arguing that the Release, if valid, is a general release covering all claims up to April 2003.  Plaintiffs argue that the Release is limited to the litigation that was settled in the Payoff Agreement, of which the Release is a part.

The Release states:

> Upon the closing referred to in Section 7 of this Agreement, the parties, on their own behalf and on behalf of all of their subsidiaries, affiliates and parent corporations, directors, officers, employees, successors, assigns and shareholders, hereby release and forever discharge each other and all of their subsidiaries, affiliates and parent corporations, directors, officers, employees, successors, assigns and shareholders, from any and all claims, causes of action, demands and/or liability, known or unknown, suspected or unsuspected, regardless of whether in law or equity, and regardless of whether under local, state, federal or foreign law, from the beginning of time through the date of the closing referred to in Section 7 of this Agreement.

(Compl. Ex. 53.)  "It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties."  *Davis & Assoc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 113 (S.D.N.Y. 2001), quoting *Berman v. Parco*, 986 F. Supp. 195, 208 (S.D.N.Y. 1997); *see also Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 603 (S.D.N.Y. 2004), quoting *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 144 (2d Cir. 2000).  "When the words of the release are of general effect the release is to be construed most strongly against the releasor . . . and the burden rests

upon the releasor to establish that general language of the release was not meant to be general." *Mt. Read Terminal, Inc. v. LeChase Constr. Corp.*, 58 A.D.2d 1034, 1035, 396 N.Y.S.2d 959, 960 (4th Dep't 1977).

The Releasor [Plaintiffs] cannot bear this burden. It is true, as Plaintiffs argue, that a court's goal in interpreting a release is to carry out the intent of the parties who have drafted the release. *See SEC v. First Jersey Sec.*, 101 F.3d 1450, 1465 (2d Cir. 1996). Plaintiffs note that the Softbank Payoff Agreement was entered into in the context of settling the action filed by Softbank in September 2002 in New York Supreme Court, and that the heading of the Release portion of the Agreement is "Termination of Litigation." However, the intent of the parties must be determined in light of their written agreement. The clear, unambiguous language contained in the Release is "of general effect," and the range of actions and time period covered is not limited. Specifically, the Release relates to "any and all claims, causes of action, demands and/or liability, known or unknown, suspected or unsuspected, regardless of whether in law or equity, and regardless of whether under local, state, federal or foreign law, from the beginning of time through the date of the closing . . ." This broad, unqualified language clearly covers actions other than the settled litigation.

"When, as here . . . a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear . . . the intent of the parties is indicated by the language employed." *Solid State Logic, Inc. v. Terminal Marketing Co., Inc.*, 2002 U.S. Dist. Lexis 13061, at *10 (S.D.N.Y. July 18, 2002), quoting *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977), *German Roman Catholic Orphan Home v. Liberty Nat. Bank & Trust Co.*, 18 N.Y.2d 314, 317, 274

N.Y.S.2d 869, 221 N.E.2d 538 (1966).  In this case, both parties were sophisticated

business entities and were represented by counsel.  If the Softbank Payoff Agreement is

enforceable, the Release would bar the claims raised in Counts I, II, III, VIII, IX and X of

the Complaint.

## H.  Punitive Damages

Plaintiffs have appended to their other claims a demand for punitive

damages.  Under New York law, punitive damages are available in a tort action

for "gross, wanton, or willful fraud or other morally culpable conduct" to a degree

sufficient to justify an award of punitive damages.  *See Shanahan v. Vallat*, 2004

U.S. Dist. Lexis 25523, at *36 (S.D.N.Y. Dec. 19, 2004) (citation omitted).[31]

Under New York law, punitive damages are not available in "the ordinary fraud

and deceit case." *Shanahan*, 2004 U.S. Dist. Lexis 25523, at *11, citing *Walker v.*

*Sheldon*, 10 N.Y.2d 401, 405, 179 N.E.2d 496, 498-99, 223 N.Y.S.2d 488, 499

(1961).  Punitive damages are ordinarily awarded in limited cases involving

"conduct that may be characterized as 'gross' and 'morally reprehensible,' and of

"'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 421 n. 10

(S.D.N.Y. 2003), quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308,

315-16, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); *see also Waltree Ltd. v. ING*

*Furman Selz LLC*, 97 F. Supp. 2d 464, 470-471 (S.D.N.Y. 2000) ("Under New

---

[31]  Punitive damages are also available in which fraud is aimed at the public generally.  *Rocanova v.*
*Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613, 634 N.E.2d 940, 943, 612
N.Y.S.2d 339, 342 (1994).  However, this line of cases relates to the "pleading elements required to state a
claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of
contract." *Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 471 (S.D.N.Y. 2000) (quoting *New*
*York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995).  Since
the allegations of the Complaint do not arise from breach of contract, it is unnecessary to address this
element.

York law, punitive damages are available in a tort action where the wrongdoing is

intentional or deliberate, has circumstances of aggravation or outrage, has a

fraudulent or evil motive, or is in such conscious disregard of the rights of another

that it is deemed willful and wanton.") (internal citations omitted).   Whether to

award punitive damages raises a question of fact.  *Waltree*, 97 F. Supp. 2d at 470-

471.  However, if a plaintiff fails to allege facts necessary to meet the standard for

punitive damages, the issue can be dealt with on a motion to dismiss.  *See*

*Shanahan v. Vallat*, 2004 U.S. Dist. Lexis 25523, at *36-7.

     Plaintiffs point to several allegations which they claim rise to the necessary level

of willful, wanton and malicious conduct, including: (i) inducement of the Debtor to rely

on its promise to purchase the Debtor in the event that the E*Trade Merger was not

consummated (Compl. ¶¶ 201-205); (ii) gaining control of the E*Trade Stock by forcing

the Debtor to enter the Softbank Lockup Agreement (Comp. ¶¶ 216-217, 237); (iii)

refusing to allow the Debtor access to the E*Trade Stock so as to enable the Debtor to

obtain financing (Compl. ¶¶ 242-243, 247-248); and (iv) forcing the Debtor to enter into

the Softbank Payoff Agreement and requiring payments thereunder, including the $11.6

million payment, the January and March 2003 Notes and the Release (Compl. ¶¶ 252,

256, 284).  Furthermore, Plaintiffs allege that Defendants, through negotiation of the

Softbank Lockup Agreement and Softbank Payoff Agreement, acted with intent to hinder

and delay the Debtor's other creditors.

     The problem with Plaintiffs' argument is that these are the same claims that have

either been dismissed or found to be insufficient as a matter of pleading.  Thus, the Court

has dismissed the claims based on promissory estoppel (item (i) above) and duress (item

(iv) above).  It has found as a matter of law that Softbank as a secured lender had a right

to seek payment of a debt and did not have an obligation to surrender its collateral or its

rights as a secured creditor (items (ii) and (iii) above).  The claims in the Complaint

relating to intentional fraudulent transfer have also been dismissed, subject to a limited

right to replead one allegation, and in any event punitive damages are rarely available in a

claim of intentional fraudulent conveyance.  *See James v. Powell*, 19 N.Y.2d 249, 260,

279 N.Y.S.2d 10, 225 N.E.2d 741 (1967); *see also Kaufman v. Chase Manhattan Bank,

N.A.*, 581 F. Supp. 350, 356 (S.D.N.Y. 1984) (striking punitive damages where defendant

acted in its own self-interest even though it had allegedly acted fraudulently in inducing

plaintiff's investment in a failing company).  On this Complaint, the request for punitive

damages must be stricken.

### III.   CONCLUSION

Counts I, II, III, IV, VIII, XI, XII, XVIII, XXV and the request for punitive

damages are dismissed.  The motion to dismiss Counts V, VI, VII, XIII, XIV, XV, XVI,

XIX, and XXIII is denied.  Plaintiff is granted leave to replead Counts IX and X with

respect to alleging harm and damages as a result of Softbank's alleged actions in refusing

to attend to vital company business, to attend Board meetings or to permit them to take

place; Counts XI and XII to allege actual fraud with respect to collusion between Amanat

and Softbank in connection with the Softbank Payoff Agreement; and Count XIX to

assert an *ultra vires* claim with respect to the Payoff Agreement.  Defendants are directed

to settle an order on five days' notice.

Dated: New York, New York
       March 2, 2007

/s/ Allan L. Gropper_____
UNITED STATES BANKRUPTCY JUDGE